## RINGLING BROS.–BARNUM & BAILEY COMBINED SHOWS, Inc., v. HIGGINS.

### No. 263, Docket 21999.

United States Court of Appeals. Second Circuit.

Argued May 11, 1951.

Decided June 8, 1951.

John F. Reddy, Jr., of New York City (Engel, Judge, Miller & Sterling and Everett H. Erlick, all of New York City, on the brief), for plaintiff-appellant.

Henry L. Glenn, Asst. U. S. Atty., of New York City (Irving H. Saypol, U. S. Atty., of New York City, on the brief), for defendant-appellee.

Before SWAN, Chief Judge, and AUGUSTUS N. HAND and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiff appeals from a district court judgment dismissing on the merits its complaint in an action for refund of $3,105.79 paid on or about June 10, 1938, as unemployment taxes for the year 1936. The sole question is whether certain persons engaged in plaintiff's circus in 1936 were employees, as the trial court held, or independent contractors, in which case the tax is not applicable. Involved are only a part of the persons engaged in producing the circus. In addition to 1,200 non-production employees, plaintiff has paid the tax, without objection, upon such performers as the chorus girls, who were trained and rehearsed and given their costumes and equipment by it; the animal trainers, who worked for it the year round, both when the circus was on the road and in winter quarters; and the "fill-in" clowns, the apprentices to the "producing" clowns who developed the original ideas for their acts. The question here concerns not only the "producing" clowns, but also the performers in the so-called "feature acts," which included aerial trapeze, balancing, highwire, trained rooster, seal, horse, dog, comic acrobatic, and "human cannonball" acts. It brings up a problem troublesome from the original enactment of the Social Security Act in 1935, 42 U.S.C.A. § 301 et seq., and rendered not less so by a superabundance of legislative attention and history.

The tax in question is imposed on the employer by 42 U.S.C.A. § 1101 et seq., carried over into the Internal Revenue Code, 26 U.S.C. § 1600 et seq., and is measured by the compensation which the employer has paid his "employees" in the course of the year. By the terms of the latter section we are referred to 26 U.S.C. § 1607 for the definition of terms used in the subchapter. 26 U.S.C. § 1607(i) originally read: "The term 'employee' includes an officer of a corporation." On June 14, 1948, this definition was amended by Pub.L.No.642, 80th Cong.,

2d Sess. c. 468, 62 Stat. 438, by the addition of the following: "but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules." A second section carried this definition over to the like provisions of the Social Security Act, 42 U.S.C.A. § 1301 (a) (6); and each section contained an additional direction that the amendment should have the same effect as if included in the original act on the date of its enactment, in the first instance "the Internal Revenue Code on February 10, 1939," and in the second "the Social Security Act on August 14, 1935."

While our case concerns the Federal Unemployment tax, yet this amendatory legislation applied equally to the identical provision under the Federal Insurance Contributions Act, 26 U.S.C. § 1426(d); and the history leading to it had concerned both these parts of the general social security legislation. The decisions of lower courts had been somewhat conflicting until the Supreme Court in 1947 gave a fairly broad interpretation to the original statute in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, and Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947, 172 A.L.R. 317, holding that "in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." Thereupon the Treasury and the Federal Security Agency proceeded to draft regulations to supersede, U.S.Treas.Reg. 90 and 91, see 331 U.S. at pages 714, 715, 67 S.Ct. at pages 1468, 1469, 91 L.Ed. 1757, to use the "economic reality" test as the basis for determining coverage. The amendatory Act of 1948

quoted above—the so-called Gearhart Resolution—was specifically directed at this new regulation, which, it was claimed, would add upwards of 750,000 employees to the number of beneficiaries of the Act and was designed to maintain the status quo "pending action by Congress on extended social-security coverage." Sen.Rep. No.1255, 80th Cong., 2d Sess., 2 U.S.Code Cong.Serv.1948, 1752. In his vigorous veto of the Resolution, President Truman took the opposite view that this would deprive that number of employees, "consisting of a substantial portion of the persons working as commission salesmen, life-insurance salesmen, piece workers, truck drivers, taxicab drivers, miners, journeymen tailors, and others," of benefits to which they were entitled under the Court's decisions. 2 U.S.Code Cong.Serv. 1948, 2501, 2502. But Congress immediately passed the Act over his veto. Ibid.

A superficial view might suggest the conclusion that Congress therefore directed a broad interpretation of the concept "independent contractor" and consequent narrowing of the category of employees. But such a conclusion will not withstand analysis. For the vigorous Committee report just cited makes the issue one of legislative preservation of the integrity of its own enactments against bureaucratic expansion and shows that the class of workers particularly in question are those also referred to in the President's message, i. e., groups clearly no more than independent contractors on even the broadest common-law interpretation.[1] Thus in the course of its extended review of the two Supreme Court cases it reiterates its own view that these were but a realistic application of the common-law rules which properly interpreted "should resolve the conflict of lower court decisions and encourage nation-wide uniformity of application of the act." 2 U.S.Code Cong.Serv.

[1]. Thus the House Committee on Ways and Means, in discussing its proposed extension of coverage in 1949 (referred to in the text, below), includes as one of its added classes, "Salesmen, and certain other employees, who were deprived of status as employees by Public Law 642, Eightieth Congress, the so-called Gearhart resolution (about 500,000 to 750,000)." H.R.Rep.No.1300, 81st Cong., 1st Sess. 1949, 6.

868

1948, 1758, and see also 1753, 1764–1770.[2] And the decisions themselves do not appear sharply extensive. As the report points out, in three of the four situations before it the Court majority held the Treasury interpretations too extensive—against vigorous dissent. In the first case it held only that unloaders of coal from railroad cars who provided their own tools and were paid by the ton were employees and declined so to hold in two different cases of truck drivers who owned their own trucks, paid the expenses of their operation, employed and paid their own helpers, and received compensation on a piece-work or percentage basis. And in the second case it held that the members of "name bands" which play short-term engagements at public dance halls were employees of the band leaders and not of the dance hall operators, notwithstanding contractual provisions designating the dance hall operators as their employers.

The later history of social security legislation appears to bear out this view of legislative intent. The long-heralded expansion of coverage actually came in the revised Act of August 28, 1950. As the congressional committees pointed out, their emphasis was upon expansion of the old age and insurance features, rather than upon the state assistance program. Con-

sequently they offered amendments to 26 U.S.C. § 1426(c), while leaving § 1607(d) unchanged. The House Ways and Means Committee recommended an extensive amendment of the provision as to "employee," retaining the existing definition but making specific additions, and ending with a catchall of suggested indicia as mentioned in the Supreme Court decisions, though a minority dissented to thus giving the Treasury Department virtually unlimited discretion to extend the definition of employee. H.R.Rep.No.1300, 81st Cong., 1st Sess.1949, 1, 14, 15, 80–91, 158, 161–163, 189–207.[3] The Senate Finance Committee struck out these general provisions, but added certain categories of service "subject to clear-cut definition," viz., full-time life-insurance salesmen, and agent- and commission-drivers distributing bakery or meat products, or laundry or dry-cleaning services—"individuals who, although not employees under the usual common-law rules, occupy substantially the same status as those who are employees under such rules." Sen.Rep.No.1669, 81st Cong., 2d Sess., 2 U.S.Code Cong.Serv. 1950, 3442, and see also 3305, 3306, 3387–90, 3441–44. The Conference Committee agreed, and the amended § 1426(d) proceeds on this basis, with specific additions to the common-law test.[4] But the Con-

2. At id. 1769, it speaks of these cases as "an applied expression of the following statement of congressional intent in the legislative history: The tests for determining the (employer-employee) relationship laid down in cases relating to tort liability, and other common-law concepts of master and servant, should not be narrowly applied (H.Rept.No. 728, 76th Cong., 1st sess., p. 61)"; then discusses "the prefatory and random remarks of the Court which have been seized upon to supply a spurious gloss of validity to the proposed Treasury regulation"; and concludes:

"If we were compelled to interpret these remarks of the Court we would say, in untechnical and summary fashion and without aiming at complete exposition, that the lower courts and administrative agencies were told: Don't be fooled or unduly influenced by the form of the arrangement to which you must apply the Social Security Act. Look to the real substance. Illuminate the usual

common-law control tests by regard for all the pertinent facts. This requires that all of the realities that will lead you to the truth must be consulted and weighed along with all other significant indicators of the real substance of the arrangement.

"But this again should be said: If we have misinterpreted these decisions of the Supreme Court, if we have incorrectly called the real moving principles of these cases, if the Treasury's interpretations and the proposed regulation based upon them are correct, then by this resolution we propose to restore the usual common-law rules, realistically applied."

3. See also note 1 supra.

4. The provision now leaves out all reference to independent contractors, viz., "(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship,

ference Report on behalf of the Managers for the House significantly took occasion "to reiterate and endorse" the statement made in enactment of amendments in 1939 that "a restricted view of the employer-employee relationship should not be taken in the administration of the Federal old-age and survivors insurance system in making coverage determinations"; then continuing in almost the same language as the report quoted in footnote 2 above, it concluded that this 1939 statement was equally applicable to the agreed-upon bill, "which contemplates a realistic interpretation of the common law rules." Conf. Rep.No.2771, 81st Cong., 2d Sess., 2 U.S. Code Cong.Serv.1950, 3493, 3494.

■ It seems to us, therefore, that this continuous insistence upon a "realistic" application of the common-law rules which shall conduce to uniformity throughout the country and shall not be a "restricted view" of the employer-employee relationship must mean—as, indeed, the reports specifically say—an application in line with the Supreme Court's actual decisions and U.S.Treas.Reg. 90, art. 205, now appearing in 26 CFR 403.204. The latter mention such matters as the right to control and direct the performance not only as to the result, but also as to the details and means by which that is accomplished, stressing that it is the right to direct which is important and it is not necessary that the employer actually direct or control the manner in which the services are performed. Other factors noted are the right to discharge and the furnishing of tools and work. Clearly we are not dealing with such clear cases of independent contractors as the regulations instance, such as physicians, lawyers, dentists, or yet with the traveling salesmen, insurance agents, and commission-drivers, who were the objects of solicitude of the congressional committees. Obviously to be included as a factor in the light of this background is the permanency of the relation, which was actually also an ele-

ment of the common-law test, 1 Restatement, Agency § 220(f) and comment f, 1933. "Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case." 26 CFR 403.204(d).

■ In considering the particular facts of this case, we must bear in mind that plaintiff is forced to seek reversal not only of the determination of the administrative agency charged with execution of the law in the first instance, but also of the findings and reasoned conclusion of an experienced trial judge. We find his memorandum of decision complete and persuasive; we shall not try to reproduce it here, but stress only the more important features to which he adverts. Both the "featured acts" and the "producing clowns" signed similar contracts, of which representative samples were in the record. While the contractual provisions denominating the artists as independent contractors are an element for consideration, yet, as demonstrated by Bartels v. Birmingham, supra, and the committee reports discussing it, this cannot be controlling, or else an employer could limit coverage with a label. The contracts were for an entire season, seven months, while the circus traveled throughout the United States. In each contract the performer granted an option to the circus to renew the contract for the next succeeding season upon the same terms. The plaintiff could, in effect, discharge by failing to renew; if it did renew, the performer could not appear at any other circus, theatre, or Wild West Show in the United States during the off season without plaintiff's written consent. The actual permanency of the relation is indicated in the testimony of Adler, the producing clown who had been with this circus for 31 years at the time of trial or since 1919, and of Concello, who made the contract for a "flying" act by his troupe "the Flying Concellos" and who

has the status of an employee" and has additional specific instances—beyond those noted in the text—of certain home work-

ers and certain full-time traveling or city salesmen. 26 U.S.C. § 1426(d), as amended.

had been with it since 1930, except for an interval from 1942 to 1946.

There were of course other features of the contracts which presented the problem. Perhaps the chief dispute was —as might be expected—on the issue of the right to control and direct. The featured acts were ordinarily employed as "packages" after they had been seen by plaintiff's management. Quite commonly all members of one act belonged to the same family; ordinarily the contract was made only with the head of the act, and he alone was paid for it. Payments were for agreed-upon sums per week; no element of profit or loss, depending upon the success of the circus tour, was involved. Costumes, paraphernalia, animals, and properties were supplied by the actors and remained under their control except for transportation, loading, and unloading, which was done by plaintiff. Equipment to be used in the performances was rigged and tested for safety by the actors. Meals, lodging, and transportation were supplied by the circus; although the artist was not required to accept, in practice of course he did on tour, as no other practical course was open. The performers were not told the cities in which they were to perform, but agreed to go wherever the circus ordered. Plaintiff also had the right to place the performer with any circus controlled by it.

The sharp issue as to control is carried to us, on appeal, where plaintiff vigorously attacks the findings of the judge. As usual, we have a difference in emphasis. Plaintiff stresses the individuality of each act; defendant and the court below, the power and the practice to weld all together into one distinctive show known and loved by young and old at "the circus." Of course the plaintiff is right in details; it could hardly be expected to direct the manner and means by which a human cannonball should be shot from a gun. That kind of artistry is indeed what it employs its performers for. But it seems to us that in a broader sense the trial judge is right—or so nearly right as not to be reversible on the facts—when he finds

an ultimate power of direction and control in the circus management. Thus he rightly says: "The performers were an integral part of plaintiff's business of offering entertainment to the public. They were molded into one integrated show, 'the circus.' It was not a loose collection of individual acts like a vaudeville show. The individuality of the performers was subordinated to the primary purpose of enhancing the reputation of the plaintiff and of producing one integrated show that would entertain the public. One example of this was the fact that, if a performer appeared in more than one act on the program, he would be given a different name by the circus each time he appeared." And elsewhere he points out the power to suggest changes, or improvements, to shorten an act, to order objectionable parts deleted, to supervise the moral conduct of the performers, to require that a certain moral standard be maintained.

Plaintiff relies heavily on Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715, where we held that the changing weekly acts at Radio City Music Hall were by independent contractors and the Corporation was not subject to this tax. But we think the differences are striking enough to point the moral. Contrast, for example, the 117 different acts there occurring in the single taxable year with the more durable relation disclosed by the contracts or the actual history of Adler and Concello here. It is true that the Radio City director did "fit" his act into the program by cutting it down where necessary, and there was a certain amount of adjustment to get a particular act into an open spot in the program which particularly featured motion pictures. But we are not disposed to reverse the trial judge as to this. Rather we agree that the performances there remained over the weeks a series of vaudeville and like disparate acts; they did not, as here, become "the circus."

Judgment affirmed.

SWAN, Circuit Judge (dissenting).

In my opinion Congress in passing the 1948 amendment intended to reject the

"economic reality" test advanced in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, and to restore the common law test as applied in the Radio City Music Hall case, 2 Cir., 135 F.2d 715. H.R.Rep. No.1319, 80th Cong., 2d Sess.; Sen.Rep. No.1255, 80th Cong., 2d Sess. The House Report, page 1, stated that "The purpose of the resolution is to maintain the status quo with respect to social-security-coverage regulations for employment and unemployment taxes * * *". The Senate Report, page 4, cited with approval this court's opinion in the Radio City Music Hall case, 135 F.2d at page 717, where Judge L. Hand said: "The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said, though the regulation redundantly elaborated it." The degree of control exercised by the appellant in the case at bar was no greater, in my opinion, than that exercised by the management of the theatre in the Music Hall case. The only substantial difference between the two cases is the longer term for which the performers committed themselves to the circus management—a distinction which I cannot regard as compelling a different result. I think the judgment should be reversed.