Maurice H. SILVER, doing business as
Morris Construction Co., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 4919.

United States District Court
N. D. New York.

Oct. 22, 1954.

Theodore F. Bowes, U. S. Atty., Syracuse, N. Y., A. Barr Comstock, Sp. Asst. Atty. Gen., of counsel, for U. S.

Alfonse J. Damico, Syracuse, N. Y., Joseph J. Lyman, Washington, D. C., of counsel, for plaintiff.

BRENNAN, Chief Judge.

This litigation raises the question as to the status of certain workers as employees, within the meaning of Section 1426(d) of the Internal Revenue Code as amended by the Act of June 14, 1948, 26 U.S.C.A. § 1426(d).

Maurice H. Silver, doing business as Morris Construction Co. (hereinafter referred to as Morris), brings this action to recover taxes paid by him under the provisions of the Federal Insurance Contributions Tax, 26 U.S.C.A. § 1400 etc., during the period from 1947 to 1950, inclusive. Such payments were computed and paid upon the basis of the earnings of certain workers termed "applicators" herein. Plaintiff claims that such payments were erroneously paid, upon his mistaken understanding that such applicators were his employees as defined in the section of the law above cited, when in fact they were independent contractors. Application for refund was prop-

erly made, same was denied and this action followed. The trial was held before the Court, the testimony of the plaintiff and one applicator was received, and it was stipulated that if all the other applicators upon whose earnings the plaintiff has paid the tax had testified that they would have testified substantially the same as the applicator witness who actually presented oral evidence, and that the plaintiff himself would have testified the same as to each individual applicator. In effect the determination of the employment status of all workers upon whose earnings the tax was paid by the plaintiff will be determined collectively rather than individually.

It is obvious that the decision here will require that the plaintiff's business methods and the facts pertaining to the business relationship of plaintiff and the applicators be examined and appraised. The evidence offered raises no serious factual dispute, and the findings of the Court are set out below in narrative form.

Plaintiff has been engaged in business at Syracuse, New York, since 1938. As far as pertinent here, it may be termed generally as a roofing and siding business; that is the furnishing and the fixing of materials to the roofs and the side walls of frame structures in need of repair. Contracts are solicited by salesmen from the owners of property. These contracts are in writing and provide a unit price for the materials and labor necessary to perform the repair or improvement which is described in general terms. No time is set out in the contract within which its obligations are to be fulfilled by either party. Such contracts are financed by Morris through a banking institution, and he receives the consideration from the bank after the owner's credit has been approved and a completion slip signed by the owner is presented to the bank. After the contract has been accepted, the materials are furnished by Morris and shipped or conveyed by him to the situs of the contract. At about this point, the applicator enters the picture.

An applicator is the person who performs the labor of affixing the roofing or siding material to the roofs or walls of the structures described in the contract. He is a person generally experienced in the work involved. Morris had the names of several such applicators who upon the completion of one job would apply for another. Newspaper ads were used by Morris to obtain additional applicators should the occasion arise. When a job was ready, the applicator came to Morris' office or was sent for by him and he was handed a plain sheet of paper, called a work sheet, which contained the name and the address of the owner of the property to be improved and a general statement of the work to be done. No measurements were contained on the paper, but the applicator was advised as to the approximate number of squares (100 square feet) to be applied. No writing was executed as between Morris and the applicator. With the exception of the work sheet, the arrangement between them was entirely oral. No price was fixed but both parties understood that payment was to be made by Morris upon a unit price set by the industry for each square of material applied, and that same would be paid upon the presentation of the completion slip signed by the owner, which in effect certified that the contract had been performed satisfactorily. No time was agreed upon or discussed within which the applicator would start or complete the work. With this somewhat informal arrangement, which the applicator was free to accept or reject, he was ready to begin his work. The applicator furnished his own transportation to the place of performance. He furnished his own tools and equipment which generally consisted of ladders, scaffolding, jacks, hammers and saws. He determined his own hours of labor and was free to hire his own helpers who would be paid by him or by Morris on his instruction. The applicator received no instructions as to where or in what manner he should start his work, or the method to be used in the application of the material. The jobs were occasionally inspected during the progress of the applicator's work by Mor-

ris, his employees or the salesmen above mentioned. It is evident, however, that Morris depended upon the fact that the applicator was a man of experience and upon the requirement that he procure a completion slip before payment was made to him, to insure that the work was being properly performed. It is further evident that the work of the applicator was of such a nature that it could only, or at least most conveniently, be performed in a generally accepted manner.

As already indicated the applicator was free to accept or reject the job offered to him. Upon the completion of a job, he was free to apply for a new job from Morris, to take no work at all or seek a job from another company engaged in a like business. Each job was separate and separate work sheets were furnished the applicator at the time he undertook same. The witness applicator apparently continued his course of business with Morris for about four years during which time he occasionally performed a few odd jobs for third persons.

## Discussion

The statute and regulation in so far as they apply here are set out in the footnote below.[1] The application thereof is guided by judicial decisions which have interpreted and applied them.

This discussion need not include reference to the conflict of lower court decisions prior to United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, nor the effect of the 1943 amendment to the statute. The case of Ringling Bros.-Barnum & Bailey Combined Shows v. Higgins, 2 Cir., 189 F.2d 865, decided by the Court of Appeals of this circuit and therefore binding upon this Court, held that the "economic reality" test adopted by the Supreme Court was not overriden by the amendment. A realistic as opposed to a restricted approach to the determination of the employee status appears to be the obligation of the court, to be performed in the light of the purpose of the statute.

1. Internal Revenue Code of 1939: Section 1426(d) "*Employee.* The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or * * *." 26 U.S.C.A. § 1426.

Treasury Regulations 106, promulgated under the Federal Insurance Contributions Act: "Sec. 402.204. *Who are employees.*—Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which the result is accomplished. That is, an employee is subject to the will and control of the employer not only as to *what* shall be done but *how* it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the serv-

ices are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee.

"Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

"Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case."

The question here is plainly a question of fact and the following quotations are appropriate.

"* * * the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." United States v. Silk, supra, 331 U.S. at page 716, 67 S.Ct. at page 1469.

"It is the total situation that controls." Bartels v. Birmingham, supra, 332 U.S. at page 130, 67 S.Ct. at page 1550.

The findings made above are sufficient in themselves to show the presence or absence of many of the elements above mentioned, so that reference will be made only to a few which might be considered as debatable or which are especially urged in the briefs filed.

The right of control of the individual performing the service as to the means and methods for accomplishing the desired result seems to be emphasized in the regulations. Without repeating facts already stated, this Court sees no more power of control by Morris over the applicators than a house owner would exercise over the independent contractor who undertook the painting of his house. Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715; Party Cab Co. v. United States, 7 Cir., 172 F.2d 87.

In effect the government relies upon Ringling Bros.-Barnum & Bailey Combined Shows v. United States, supra, in which the elements of control, furnishing of equipment, right of discharge and the permanency of the relation are specifically discussed. See also Zipser v. Ewing, 2 Cir., 197 F.2d 728. Control as it applies in this case needs no further discussion. The equipment and tools necessary for the performance of labor of the applicator is entirely his obligation here. The money value of the investment therein does not appear in the record, but from the description it must be something more than nominal. The right of Morris to discharge the applicators is no different than the right of a general contractor to declare a sub-contract breached. As to the permanency of the relationship, the record is not clear except that several jobs were performed by the applicator during the period of three years covered by the complaint, but permanency of relationship can hardly be said to exist or be a weighty element where each obligation was of comparatively short duration and the worker was free to accept or reject the offer of a new or similar obligation.

 It is urged that the informality of the arrangement and the fact that it was fashioned to afford a reasonable financial return for a day's labor require that the applicators be found to be employees under the reality test. The difficulty with the argument is that the reality test means more than suspicion, and further that it is a reality in common experience that many independent contracts involving primarily the performance of labor are offered and accepted upon a basis of a reasonable hourly, daily or weekly return for the labor performed.

It is likewise common experience that business is often conducted through independent contracts in order to avoid the impact of liability and taxes. This motive is not unlawful. To apply common law principles and rules is the statutory requirement. The precedents authorize some elasticity in their application, but the history of this legislation indicates that the court should be careful not to ignore them lest it enter the legislative field by way of construction.

 It is found that the applicators upon whose earnings the plaintiff paid the tax as alleged in the complaint were not the employees of the plaintiff, and

It is concluded that this Court has jurisdiction of the parties to and the subject matter of this action and that plaintiff is entitled to judgment as demanded in the complaint; same to be prepared by the plaintiff, and if not agreed upon, to be settled on five days' notice, and it is

So ordered.