Leslie R. BEN, doing business as Ben
Construction Company, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 5528.

United States District Court
N. D. New York.

Jan. 9, 1956.

I. Gerald Pliskin, Syracuse, N. Y., for
plaintiff.

Theodore F. Bowes, U. S. Atty., Syra-
cuse, N. Y., H. Brian Holland, Asst. Atty.
Gen., Andrew D. Sharpe, Anthony T.

Dealy, Attorneys, Dept. of Justice, Washington, D. C., Bernard Burdick, Asst. U. S. Atty., Syracuse, N. Y., for U. S.

BRENNAN, Chief Judge.

This action is brought to recover taxes paid by the plaintiff under the provisions of the Federal Insurance Contributions Act, Title 26 U.S.C.A. § 1400 et seq. and the Federal Unemployment Tax Act, Title 26 U.S.C.A. § 1600 et seq. The period involved in this litigation extends from July 1, 1948, through December 31, 1951. The taxes, for which recovery is sought, were computed and paid upon the earnings of certain workers who are termed "applicators" in this litigation. The crux of the litigation is contained in the plaintiff's contention that the taxes, above mentioned, were paid under the mistaken impression that said applicators were employees as defined in Title 26 U.S.C.A. § 1426(d) and § 1607(i) when in fact they were independent contractors. The status of several employees is involved in this suit. It seems to be conceded however that the evidence offered is to be applied as to each person upon whose earnings taxes were paid and that the decision will apply to each of them. In other words, the decision will define the status of the workers collectively rather than individually. Any computations made necessary by the decision are reserved to be agreed upon by the parties or determined by the Court.

A similar action was tried before this Court and decided in October 1954. The decision is reported under the name of Silver v. United States, D.C., 131 F.Supp. 209, 210, and the following paragraph is borrowed therefrom as an introduction to the findings herein.

"It is obvious that the decision here will require that the plaintiff's business methods and the facts pertaining to the business relationship of plaintiff and the applicators be examined and appraised. The evidence offered raises no serious factual dispute, and the findings of the Court are set out below in narrative form".

Plaintiff has been engaged in business at Syracuse, N. Y., since 1948. The business may be referred to generally as a roofing and siding business; that is the furnishing and affixing of materials to the roofs and sidewalls of frame structures in need of repair. Contracts are solicited from property owners by canvassers who obtain prospects and refer them to salesmen known as "closers". The closers actually obtain a written contract which is executed by the owner and by the plaintiff which in general terms describes the materials to be furnished and the labor to be performed, together with a total price to be paid therefor. No time is set out in the contract as to when the work is to be performed. Estimates of the amounts of materials required are computed by the salesmen and the unit used in such computation is known as a "square" which contains 100 square feet. The required materials are delivered to the job site by truckmen hired by the plaintiff. The majority of the contracts, above referred to, are financed through a banking institution and it is apparent that the plaintiff receives the consideration set out in the contract from such institution after the owner's credit has been approved and a completion slip, signed by the owner, is presented to the bank.

At about the time of the delivery of the materials to the work site, workmen, herein referred to as "applicators", enter the picture. An applicator is the person who performs the labor of affixing the roofing or siding materials to the roofs or walls of the structures in accordance with the contract. During the time period involved here, a number of applicators appeared to depend upon the plaintiff for such employment especially during those seasons of the year when such work could be advantageously performed. Some of them, who might be termed "regulars", have performed such service for the plaintiff from 1948 to the time of the trial.

The separate arrangements between Ben and the several applicators were entirely oral and lacked the formality of the ordinary contract. The pay of the applicators was fixed by a unit price per square which price appeared to be fixed by the trade rather than by individual negotiation between the applicator and the plaintiff. When the applicator desired to offer his services, he entered Ben's office and, without more ado, he was handed a work sheet which had written upon it the instructions necessary for the performance of the contract heretofore obtained from the owner. The work sheet contained no particular details but the amount of the material necessary to be applied (the number of squares) appeared thereon and of course the location where the work was to be performed. No further discussion took place between Ben and the applicator. It appeared to be understood that payment was to be made to the applicator upon the presentation of the completion slip, signed by the owner, which in effect certified that the contract had been performed satisfactorily. No time was agreed upon or discussed within which the applicator would start or complete the work. The applicator was free to decline the work sheet offered. In such an event, however, Ben would not generally offer him additional work. It was expected that he would take each job offered. Ordinarily it is apparent that the applicator would take the work sheet and depart from the office, using his own transportation to the place of performance of the labor required. He furnished his own tools and equipment which generally consisted of ladders, scaffolding, jacks, hammers and saws. He determined his own hours of labor and if he desired a helper, he arranged therefor and fixed his compensation. The helper would be paid by Ben on the instruction of the applicator. No instructions were given to the applicator as to where or in what manner he should start his work or the methods to be used in the performance thereof. It is evident that the work of the applicator could ordinarily be performed only in a particular manner, recognized and followed in the trade. If a question arose in the mind of the applicator as to the performance of the work, he called the company office. Complaints from the owner and defective work would ordinarily be rectified by the applicator without any additional compensation. If the applicator was not available, Ben would arrange to have someone else make the repairs and to pay to that person the cost thereof.

Occasionally upon reaching the job site or in the course of the performance of the work, the applicator found that repairs were necessary which were not included in the work sheet, or that the house owner desired some additional work performed or condition remedied which was not contained therein. Such extra services generally consisted of carpentry work such as made necessary by defective roof gutters or wooden siding. When such a condition arose, the applicator was instructed to call the attention of Ben to same and after arrangements were made with the house owner, the work was performed by the applicator upon a unit basis or paid for by Ben on an hourly basis. The single applicator who testified upon the trial was definite in his understanding that all requests for extra work (except in very minor matters) and all job inquiries were to be referred to plaintiff. The plaintiff himself confirms the understanding and further would consider it a breach of faith if an applicator would undertake to furnish materials and apply same on his own account, under a separate arrangement with such a prospect.

Ben, or his representative, would occasionally appear at the job site but there is no evidence of supervision of the manner in which the work was being performed. It is evident that plaintiff felt that he could dismiss an applicator if his actions were detrimental to the job. On one occasion, he dismissed an applicator from a particular job because his action thereon offended the home owner. Signs, indicating that the job was being

performed by the Ben Company, were occasionally placed at the job sites. The applicator carried no public liability insurance.

Upon the completion of the work indicated in the work sheet, the applicator would present the completion slip at the company office. He would receive his compensation and another work sheet was handed to him and the process, already described, repeated. All applicators were paid on the same basis.

The particular applicator, sworn as a witness in this case, was employed by the plaintiff for about three years. He apparently did not do work during that period for other roofing companies although he was not actually prevented therefrom. This witness indicated a sense of loyalty to the Ben Company which he felt would be compromised if he took work from another roofing company.

### Discussion

It would appear to be without profit to again discuss the statutes, regulations and decided cases which are referred to in the decision of Silver v. United States, supra. They are referred to in that decision in sufficient detail to indicate the guide posts to the conclusion to be made here.

Factually the two cases differ in several important aspects even though they may be considered as embodying the same general situation. The right of control over the applicator, which is the emphasized element of the employer-employee relationship, is evidenced more strongly in this case. Here we have on the part of the plaintiff the right to discontinue the services of an applicator because of his personal actions in the performance of the work assigned to him. Here the refusal of a particular job by an applicator in effect means the cessation of further opportunities for employment by the plaintiff so that it is difficult to distinguish between the situation of an applicator who refuses a proffered job and an employee who declines to perform allotted work. The ultimate sanction imposed upon both is the same. Here a loyalty of the applicator to the plaintiff is required and given which restricts the applicator from the performance of outside work which would be considered as placing the applicator in a position of competition to the plaintiff's business. No doubt there is a difference between the loyalty which distinguishes the employer-employee relationship from that required in the independent contractor relationship. How such difference may be defined need not be decided but an independent contractor is not required to give up opportunities for profit in independent ventures which come to his attention by reason of the particular job he is performing. Here also we have direct evidence of long continued employment by the applicators over a period of years and approximately no evidence of any affirmative act on the part of the applicators in offering their services to the public. Here also we have a co-mingling of a unit price for material applied with that of an hourly rate for a so-called extra work performed.

All of the circumstances, from the time the applicator receives his work sheet down to the time of the completion of the job, indicate restrictions actually imposed upon and accepted by him in many respects. The element of freedom from control in the manner of the performance of the work, emphasized in some decisions, loses much of its significance when the skill of the worker is relied upon in the accomplishment of the particular task. The broad right to discharge an applicator asserted here by the plaintiff and recognized by the worker is indicative of a right of control of both details and time of performance. That such right was not exercised is no answer; it is the existence of the right which controls.

We are reminded in Bartels v. Birmingham, 332 U.S. 126, at page 130, 67 S.Ct. 1547, at page 1550, 91 L.Ed. 1947, that in considering whether or not the status of an independent contractor exists that "It is the total situation that controls". It is therefore improper to isolate each characteristic of that rela-

tionship and give it individual weight apart from the situation disclosed by the evidence as a whole. State administrative decisions do not control. Diamond v. Sturr, 2 Cir., 221 F.2d 264.

The administrator here has determined that the applicators who rendered services for the benefit of the plaintiff were in fact employees. The burden is therefore upon the plaintiff to show otherwise and this burden he has not borne.

It is concluded that this Court has jurisdiction of the parties to and the subject matter of this action; that plaintiff has failed to establish a claim as set forth in the complaint and that same should be dismissed and judgment is directed accordingly.

It is so ordered.