Dubfee, Judge,
delivered the opinion of the court:
Plaintiff, Ben Construction Corporation, sues to recover taxes paid during the period January 1, 1955, through June 30, 1958, pursuant to the Federal Insurance Contributions Act, 26 U.S.C. (I.R.C. 1954) § 3101 et seq. (1958 ed.), and the Federal Unemployment Tax Act, 26 U.S.C. (I.R.C. 1954) § 3301 et seq. (1958 ed.).
Ben Construction Corporation is a home improvement contractor in the State of New York, engaged primarily in the business of applying new roofing and siding to buildings. Plaintiff advertises for, and procures the services of “applicators” who perform the actual physical labor involved. Applicators go to plaintiff’s office and request work. Plaintiff will offer a qualified applicator a worksheet which describes the roofing and siding to be done on a particular structure, and if the applicator agrees, he is given the worksheet and directed to carry out the job. Upon finishing a roofing and siding project, the applicator obtains a certificate of completion from the property owner, delivers the. certificate to plaintiff, and the applicator is thereupon paid for his labor. Payment is usually made on the basis of the amount of roofing and siding applied to the building.
Plaintiff contends that these applicators are not employees of Ben Construction Corporation within the meaning of sections 3121(d) and 3306 (i) of the aforementioned Federal Acts. Plaintiff argues that they are independent contractors; consequently, plaintiff is not liable for, and should have refunded to it, the Federal employment taxes paid. Defendant asserts that the applicators are employees within these taxing statutes, and further, that the Federal District Court for the Northern District of New York has already determined this issue adversely to plaintiff. Ben v. United States, 139 F. Supp. 883, affirmed, per curiam, 241 F. 2d 127 (2 Cir. 1957).
Plaintiff Corporation was organized in 1954 under the laws of the State of New York. Prior to 1954, Leslie R. Ben, President of the Corporation, operated this same business as the Ben Construction Company.
*606 Leslie R. Ben paid Federal employment taxes for the period July 1, 1948 through December 31, 1951, under 26 U.S.C. (I.E.C. 1939), §§ 1400 et seq. and 1600 et seq. (1952 ed.). These sections of the 1939 Internal Revenue Code precede, and are substantially the same as, the provisions of the 1954 Code under which Ben Construction Corporation has paid the taxes involved in this litigation. Following payment of the 1948-1951 taxes, Mr. Ben requested that they be refunded to him for the same reason that the Ben Construction Corp. now seeks a refund in this case; that is, that the applicators aré independent contractors, not employees. The •Tax Administrator rejected Ben’s 1948-1951 claim, and the suit that followed in the Federal District Court in New York ' upheld the Administrator’s determination. Defendant submits that this prior Ben casé is dispositive of the issues presented in this proceeding, and we should therefore dismiss plaintiff’s claim for refund of the 1955-1958 taxes paid.
When two suits involve similar facts and issues, and the Court rendering the first judgment has fully considered all ■ the evidence and given its decision thereon, the Court in the second case is free to follow that prior judgment upon the principle of stare decisis, provided such consistency is just and desirable. Commissioner v. Sunnen, 333 U.S. 591 (1948).
Ben v. United States, supra, determined that the roofing and siding applicators were not independent contractors but were employees of Leslie R. Ben, d/b/a Ben Construction Company. This question was, and is again in our case, “a close one.” Ben v. United States, 241 F. 2d 127, 128. There is nothing in either proceeding, however, which causes us to view the District Court’s opinion as unjust or undesirable. Accordingly, we have determined to follow this holding and apply it as the rule in our case.
The prior suit brought by Leslie E. Ben concerned the 1939 Internal Revenue Code. We are dealing with the 1954 Code. A comparison of sections 1426(d) and 1607(i) of the 1939 Code, with sections 3121(d) and 3306(i) of the 1954 Code, respectively, convinces us that Congress intended to and did enact the same definitions of employee in the 1954 Acts that *607 are given in the 1939 Code. Ben Construction Corporation does not even attempt to argue otherwise.
The only serious objection made by plaintiff in the case at bar to the extension and application of the prior holding, is its argument that the material facts in the employee-independent contractor dispute changed in the later tax years. Plaintiff asserts that there is a new situation existent in the 1955-1958 plaintiff-applicator relationship. Turning to the prior adjudication, at 139 F. Supp., 883, the Court stated on page 886, “The right of control over the applicator * * * is the emphasized element of the employer-employee relationship * * The facts the Court relied upon to demonstrate the control that Ben exercised over his applicators are all given in the opinion. They are the same facts that we have found to be present in this suit except for one or two variances which plaintiff points out and which we feel obligated to discuss. Chief Judge Brennan stated that for the 1948-1951 tax period, “the refusal of a particular job by an applicator in effect means the cessation of further opportunities for employment by the plaintiff * * (p. 886) We have found that for the 1955-1958 period, applicators were not required to accept every worksheet offered them by plaintiff as a condition to receiving further work from plaintiff. Applicators did on occasion reject a worksheet offered them by Mr. Ben and thereafter were offered other worksheets. In the prior years the applicators may not have worked for other roofing companies. However, in the later period, at least some applicators did jobs for other companies in between jobs for plaintiff. These asserted changes in Mr. Ben’s operations, if they are such, are the ones plaintiff relies upon most confidently.
Granting that these are actual differences, the only thing they seem to add up to is a change in the amount of business plaintiff was doing. Evidently it was an employers’ market in the prior years and an employees’ market in 1955. Mr. Ben’s testimony bears this out. In 1951 he could afford to be a bit more choosy with the applicators. It might have been because he had few competitors at the time, or he simply didn’t have so many jobs lined up that he meded the applicators. In 1955 Ben realized that he wasn’t going to get *608 his jobs completed and get his money unless he could send the applicators out on the jobs. Ben now had to be more solicitous of these men; he could not afford to turn them away if they balked at a particular job, or had worked for another company.
The District Court held that, “All of the circumstances, from the time the applicator receives his worksheet down to the time of the completion of the job, indicate restrictions actually imposed upon and accepted by him in many respects.” (p. 886). This control while the applicator is on a job for plaintiff is a different matter than plaintiff’s ability to get the applicators in the first instance to perform for it. A secretary is no less an employee when others are offering her better wages and less hours, than she is when she couldn’t possibly obtain another position. In effect, all that plaintiff has demonstrated to us is that the applicators were in a better bargaining position in 1955 than they were in 1951. It seems doubtful that this situation effects a vital change in the basic employer-employee relationship that Chief Judge Brennan has recognized.
There is serious doubt in our minds that the situation actually changed as much as we have just pointed out. Plaintiff presents the facts in a fashion too cut and dried: in 1951 no applicator would or could work for another company or refuse a worksheet; in 1955, the situation turned 180 degrees. In the District Court decision again, we note that the opinion carefully points out that many applicators are involved and “the decision will define the status of the workers collectively rather than individually.” (p. 881). Further along the Court mentions that the work is seasonal and that only some of the employees might be termed “regulars.” Only one applicator, a regular, testified in this prior suit. For the 1955-1958 period there were only three or four “regulars,” yet in the busy season there would be 20 or 30 applicators working. The non-regulars in both tax periods were obviously not full-year employees of plaintiff. Surely they worked somewhere else when not engaged with plaintiff, and possibly as applicators. They could not become employees until they actually accepted a job. In neither tax period was an applicator guaranteed another worksheet after he completed a roofing *609 and siding project. During both periods the applicators were paid on the basis of the squares of siding or roofing they affixed to a customer’s home; they were paid as soon as they finished a job. The employment in both tax periods then, is a series of stops and starts. In neither period of time was any applicator ever required to be on hand. There were no hours or days set by Ben for any of them to be at work. An applicator could go on vacation whenever he wished; he need never come back to Ben’s office after he had once or fifty times taken a worksheet from plaintiff. Mr. Ben’s assertion that in 1955 he would give a man a job even after he had turned down another worksheet, or had worked for another company, is not in reality a substantial change from the prior years. In 1951 he might not rehire the applicator, or keep him on after he turned down a job; in 1955 Ben appeared to be less demanding and the applicator more secure. In both 1951 and 1955 the applicator’s relationship to plaintiff is marked by this stop and go status. In between jobs an applicator was not paid; he did not have to come back for another job; he could not be sure he would get another job. Plaintiff was not bound to give him more work. The relationship for both tax periods was rather clearly a job-to-job employment.
Ben v. United States, supra, states that the applicator, in 1951, was free to decline a worksheet, in which event Ben “generally” did not offer him another job. (p. 885). Again, applicators in 1951 were “not actually prevented” from doing work for other roofing companies, (p. 886). It is not unlikely that in these tax years Ben may, on occasion, have suffered an applicator to refuse one worksheet and then offered him another. The District Court opinion does not rule out this possibility.
In summary, the only evidence as to change in treatment of the applicators by plaintiff in the later tax years is Mr. Ben’s testimony given at the trial before the Commissioner. Two applicators, the only other witnesses produced on plaintiff’s behalf, testified that their arrangements with the Ben Construction Company did not differ from their arrangements with the Ben Construction Corporation. The *610 new circumstances that plaintiff says existed in the 1955-1958 tax years are inconclusive.
This claim for a tax refund for the years 1955-1958 must be dismissed. We are satisfied that plaintiff’s 1955-1958 business practices are for all significant purposes identical with Ben’s 1948-1951 operations, and consequently we adhere to the precedent set by the prior Ben v. United States case, supra. The applicators engaged by plaintiff in the later tax years and involved ill the present case were also employees of plaintiff.
Although it is not necessary to sustain the conclusion we have reached in this proceeding, we note that Ben Construction Corporation, plaintiff in this suit, is in privity with Leslie R. Ben, doing business as the Ben Construction Company, plaintiff in the prior suit. Leslie It. Ben and his wife own virtually all of the outstanding stock of the Ben Corporation. Ben’s incorporation in 1954 cannot alone sever this continuity. United States Envelope Co. v. Transo Paper Co., 221 Fed. 79 (D.C. Conn. 1915); Stafford v. Russell, 117 Cal. App. 2d 319, 255 P. 2d 872, cert. denied, 346 U.S. 926 (1953); McNamara v. Powell et al. 11 N.Y.S. 2d 491, 256 App. Div. 554 (1939).
Plaintiff’s petition is dismissed, and judgment is entered to that effect.
Reed, Justice {Bet.), sitting by designation; Davis, Judge; Laramore, Judge; and JoNES, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows :
1. Plaintiff, a corporation organized in 1954 under the laws of the State of New York, is and was at all pertinent times engaged in the roofing, siding, and home improvement business in and around Syracuse, New York. Since its incorporation virtually all of the outstanding stock of plaintiff has been owned by Mr. Leslie R. Ben, president of plaintiff, and his wife. Prior to the incorporation of plaintiff, Mr. Ben operated the business as Ben Construction Company.
*611 2. Plaintiff brings this action to recover from defendant Federal Insurance Contribution Act taxes for the period from January 1, 1955 through June 30, 1958. The principal issue in this case is whether individuals, known as applicators, who performed services for plaintiff in installing the roofing and siding materials were, during the aforesaid period, employees of plaintiff or independent contractors. The parties stipulated, pursuant to Eule 38(c), that the trial would be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
3. Plaintiff engaged the services of salesmen to solicit written contracts between plaintiff and homeowners for the sale and application of roofing and siding. The salesmen were furnished by plaintiff with a square foot price for installed roofing and siding and the profits of the contracts were divided between plaintiff and the salesmen on a percentage basis. The salesmen have been administratively determined by defendant to be, for tax purposes, independent contractors and their status is not an issue in this case. The contract form provided that plaintiff would furnish all materials and perform all labor pursuant to the specifications of the contract, and provided a space for the total sum which the homeowner was to pay upon completion of the work. In the event the homeowner desired a deferred payment plan, plaintiff processed his credit application in order to obtain the necessary loan from a lending institution. The contract form provided that upon completion of the work the homeowner would sign and deliver to plaintiff a certificate of completion. The contract form further provided in part as follows:
The work, labor and services to be rendered and the materials to be furnished are fully and completely expressed herein and the Contractor shall not be required to perform any work, labor and services or to furnish materials which are not herein expressed. In the event that the Owner shall request the Contractor, either orally or in writing, to perform additional or other work, labor and services or to furnish such other materials, than as herein provided, the Owner shall pay to the Contractor the sum which shall become due ■ for same and said sum shall be added to the original sums *612 as hereinabove set forth and which total sums the Owner hereby agrees to pay. * * *
‡ $ $ $ $
The Contractor shall not be liable for any default or delay by any contingency beyond its control, or the control of its supplier or manufacturer with whom it may or shall contract to cover this sale, or the manufacturer who is to furnish these goods, including war, credit, strikes, lockout, accident, floods or fires. And if for any reason herein stated, the contractor shall be unable to complete this agreement pursuant to the terms thereof, the contractor, at its option, may cancel the within agreement, refund the monies paid hereunder, and be released from the terms and conditions of this agreement.
# * # í¡t :$*
* * * During the performance of this agreement by the Contractor, however, the Owner shall have the right to orally or by writing request the Contractor to perform other or additional work, labor and services or to furnish such other or additional materials than is herein set forth, and upon compliance therewith, the Contractor shall be entitled to be compensated therefor by the Owner as hereinabove provided.
The contract form did not fix a time for either the commencement or completion of the work.
4. After the contracts were executed and arrangements made for payment (either cash or credit arrangements through a lending institution), a worksheet was prepared by plaintiff. The worksheet contained the name and address of the homeowner, a general description of the work to be performed, and the number of squares (100 square feet) of siding or roofing material to be applied.
A typical worksheet contained the following general description of the work to be done:
Ee-side entire wood shingle area oe house, including garage with Alsco Green Aluminum clapboards. Cover area to be resided with Silvercote. Use starter strip on bottom course. Use backer strips where necessary. Fur out surface of home with Lath. Eenail any clapboards where necessary. Use hangers or clips where necessary. Use wood cove molding on sides of windows and doors. Caulk and seal all windows and doors. Use Alsco Green Aluminum eomerpieces on all comers of house.
*613 The worksheet did not contain specific directions as to the manner of application of the materials.
5. Plaintiff maintained an office and warehouse for the transaction of its business. It employed office and maintenance help who had regular working hours, were paid regular salaries, and over whom plaintiff exercised supervision and control. The office and maintenance help are conceded to be employees and their status is not an issue in this case.
6. In order to obtain the services of applicators, plaintiff maintained a list of qualified applicators whom plaintiff would call when their services were required. Plaintiff also advertised in the newspapers for applicators. The ads represented that the applicators would receive “top pay.” Applicators also would come to plaintiff’s office where they would solicit work.
7. The amount of applicating work varied according to the volume of contracts produced by the salesmen. There were 3 or 4 “regulars” and in peak periods there would be 20 to 30 applicators engaged in the work. Plaintiff engaged only experienced, well-qualified applicators.
8. The arrangements between plaintiff and the applicators were oral. When the contract with a homeowner was executed, plaintiff, acting generally through its president, Leslie B,. Ben, w'ould hand a worksheet to an applicator at plaintiff’s office. The understanding between plaintiff and the applicator was that the applicator would be paid on the basis of the number of squares specified in the worksheet. Plaintiff fixed the rate per square. Occasionally a job would require an unusual amount of work because of the number of gables or similar circumstances, in which event Mr. Ben and the applicator would discuss the matter and generally arrive at a mutually agreeable additional amount to be paid for the work. If a contract with a homeowner required remodeling work in addition to siding or roofing, Mr. Ben and the applicator also discussed and generally agreed on a rate of pay for the remodeling work. If the jobsite was outside a radius of 50 miles from Syracuse, the applicator was paid a higher rate per square so as to reimburse him for traveling expenses.
9. Although the applicators generally accept the work *614 sheets as offered to them, at times an applicator would reject a worksheet, in which event it would be given by plaintiff to another applicator. During the period in question (January 1, 1955 through December 31, 1958), applicators were not required by plaintiff to accept every worksheet offered them by plaintiff, nor to work on plaintiff’s contracts to the exclusion of contracts of other home improvement firms as a condition to receiveing worksheets from plaintiff. Applicators did on occasion reject a worksheet offered them by Mr. Ben and thereafter were offered other worksheets (jobs) by Mr. Ben and accepted them. Applicators also, after completing a job for plaintiff, did applicating work for other home improvement firms, and thereafter were offered other worksheets (jobs) by Mr. Ben and accepted them. All of the applicators performed their services in substantially the same manner and had virtually the same arrangements with plaintiff. None of the applicators was guaranteed any number of jobs by plaintiff and when an applicator finished a particular job, plaintiff might or might not offer him another job.
10. An applicator sometimes arranged for another applicator to work with him, and for a division in the compensation without the necessity of plaintiff’s approval. Applicators also occasionally engaged helpers and fixed their rate of pay, hours of work, and working conditions without the necessity of plaintiff’s approval. Plaintiff would issue checks within the limits of the total amount of the compensation for a job to the persons and in the amounts requested by the applicator to whom plaintiff gave the worksheet.
11. The materials for the jobs were furnished by plaintiff who either delivered them or arranged for their delivery to the jobsite. If an applicator transported the materials to the jobsite, he received reimbursement from plaintiff for the cost of delivery. Each applicator furnished his own tools and equipment which generally were valued at between $1,000 and $1,500 exclusive of his car or truck. Each applicator paid his own expenses.
12. The applicators determined their own hours of work and the days they would work on a particular job. The ap *615 plicators did not receive paid vacations nor were they prevented from taking a vacation at any time.
13. The applicators were not members of a labor union and all dealings between the applicators and plaintiff were on an individual basis.
14. None of the applicators advertised in the newspapers or maintained telephone listings or an office.
15. Occasionally a sign was displayed at a jobsite which stated that the work was being done by plaintiff, the Ben Construction Corporation.
16. There was no well-defined understanding between plaintiff and the applicators respecting the degree to which plaintiff had the right to control and direct the applicators in the performance of their work. It was generally agreed that plaintiff did not have the right to direct the applicators in the detailed manner or method in which they wpuld perform their work, so long as their work was being done in accordance with the worksheet. For example, plaintiff “did not presume” to tell an applicator which side of the building to begin on. It was understood that if an applicator was doing his work properly, plaintiff had no right to discharge him, and the applicator would be entitled to full pay for the job if plaintiff did discharge him. If, however, an applicator’s work was not in accordance with the worksheet, it was understood that plaintiff had the right to issue directions to the applicator to do his work properly or to discharge him and “move into the job and get the work done properly and hold the applicator responsible for any damage.” The witnesses at the trial equated “faulty work” and “improper application of material” with “work which was not in accordance with the worksheet.”
As a matter of practice, plaintiff did not, during the period in question, issue directions to or discharge an applicator.
17. Plaintiff frequently instructed the applicators to be less wasteful of materials. Occasionally plaintiff requested an applicator to leave the job he was working on and “spike” another job. “Spiking” a job means to start a new job in order that the customer will be assured that the contractor has undertaken the work. It was generally understood that *616 if an applicator desired the job which he was requested to “spike” he was obliged to leave temporarily the job on which he was engaged to “spike” the new job.
18. It was understood by plaintiff and the applicators that all leads for new business which developed at a jobsite would be referred by the applicators to plaintiff who would pay the applicators a commission if new business resulted. This understanding did not embrace extra minor work which the homeowner might desire such as the repair of a lock, in which instance the applicators would make their own arrangements for pay with the homeowner.
19. The applicator who performed the work on a job was required to correct defects without additional compensation. If an alleged defect turned out to be work beyond the scope of the original worksheet, the applicator would be paid additional compensation by plaintiff.
20. Upon completion of a job and presentation to plaintiff by the applicator of a certificate of completion signed by the homeowner, the applicator was paid by plaintiff. The applicator was not obliged to wait for a regular payday but was paid upon presentation to plaintiff of the certificate. The applicator was paid on the basis of the number of squares specified in the work order even though in completing the job he may have applied a lesser number.
21. Plaintiff, as a matter of bookkeeping convenience to an applicator, would designate a portion of his gross earnings as expense for income withholding tax purposes. The expense was not in addition to the applicator’s compensation. During the period in question plaintiff carried a workmen’s compensation policy, a group hospitalization policy, and a fidelity bond on the applicators who were designated in each of the foregoing as employees.
22. On January 9, 1956, the United States District Court for the Northern District of New York rendered its opinion in an action brought by Leslie R. Ben, doing business as Ben Construction Company, to recover from defendant Federal Insurance Contribution Act taxes for the period from January 1, 1948 through December 31, 1951. The principal issue in that case was the same as in the instant case. In *617 reciting the facts of that case, the opinion reads in part as follows:[1]
* * * The applicator was free to decline the work sheet offered. In such an event, however, Ben would not generally offer him additional work. It was expected that he would take each job offered. * * *
*****
The particular applicator, sworn as a witness in this case, was employed by the plaintiff for about three years. He apparently did not do work during that period for other roofing companies although he was not actually prevented therefrom. This witness indicated a sense of loyalty to the Ben Company which he felt would be compromised if he took work from another roofing company.
In rendering judgment for defendant the court stated in part:
The administrator here has determined that the applicators who rendered services for the benefit of the plaintiff were in fact employees. The burden is therefore upon the plaintiff to show otherwise and this burden he has not borne.
On February 7, 1957, the United States Court of Appeals for the Second Circuit in a per curiam opinion affirmed the decision of the District Court, and stated that although “the case is a close one, we cannot say the District Court improperly refused to upset the administrator’s determination that the applicators were ‘employees’ within the statutory scheme.”[2]
23. At the trial of the instant case plaintiff’s president, Leslie R. Ben, testified respecting changes in his arrangements with the applicators, beginning in January of 1955, as follows:
Well, prior to that period, * * * if a man wouldn’t accept work as it came along, I generally wouldn’t give him any more; however, this became a problem in that I couldn’t complete the contracts, and I had to change. I offered these fellows this work, and if they didn’t do it, I couldn’t say to them, “Well, you can’t have any more work.” I would try to get them to do this particular job, and if I couldn’t I would offer them another one. Prior to this period, I used to want them to *618 work for me alone, and I found that was impossible, because when the busy season came other people would offer them more money, and I just had to change this arrangement, or not be able to get my own contracts completed and get my money, so that I could continue in business.
Q.. Were there any other significant changes in your relationship with the applicators, beginning in January of 1955, as compared to the preceding period?
A. Could you qualify the word “significant” for me? I don’t understand that.
Q. Well, any changes that you can think of, other than those that you have just recited ?
A. Basically, that was the big change. I realized that I couldn’t run this and treat them as employees; I had to treat them as subs, and put them on these jobs, and this was the way that I was going to get my work done. I had to more or less follow the procedure of the other companies, and this was the way they were doing it.
24. In addition to plaintiff’s president, two applicators testified on behalf of plaintiff at the trial. Both of the applicators had worked for the Ben Construction Company prior to January 1, 1955, and had worked for Ben Construction Corporation during the period from January 1, 1955 to June 30, 1958. Each of the applicators testified that his arrangements with the Ben Construction Company (prior to January 1, 1955) did not differ from his arrangements ■with the Ben Construction Corporation (after .January 1, 1955).
25. Plaintiff filed its quarterly Federal employment tax returns and its annual excise tax returns for employees with the District Dii’ector of Internal Revenue in Syracuse, New York, covering the period involved in this case, and paid the Federal Insurance Contribution Act taxes and Federal unemployment taxes on the earnings of its regular employees as Avell as on the earnings of the applicators.
26. Plaintiff filed timely claims for refund of the taxes alleged to have been erroneously paid on the earnings of the applicators.
27. On or about March 16, 1959, the District Director of Internal Revenue disallowed plaintiff’s claims and plaintiff executed a waiver of the disallowance by registered mail. Plaintiff’s petition was thereafter timely filed in this Court.
*619 COKOLTJSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is dismissed.

 139 F. Supo. 883.

 241 F. 2d 127.