**BONNEY MOTOR EXPRESS, INCORPORATED, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 2900.

United States District Court
E. D. Virginia,
Norfolk Division.
June 22, 1962.

Toy D. Savage, Jr., Willcox, Cooke, Savage & Lawrence, Norfolk, Va., for plaintiff.

C. V. Spratley, Jr., U. S. Atty., Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

In this action seeking the recovery of certain withholding and social security taxes paid by the plaintiff, the operator of a trucking business, the single issue involves the status of a class of persons known as "gypsy chasers" who are used for the purpose of loading upon and unloading from plaintiff's trucks the cargo being carried in interstate commerce.

Plaintiff is a common carrier of specified commodities by motor truck over irregular routes operating under franchise from the Interstate Commerce Commission. Its activities are in thirty-two states, mainly in the eastern, southern and midwestern sections of the country. Primarily the trucks carry agricultural products and foodstuffs. Its principal place of business is in Norfolk and it does not attempt to maintain offices, terminals, agents or employees in each of the many cities and towns to which the cargo is carried or from which it is received.

By its contract of carriage plaintiff is required to deliver its cargo to the dock

of the consignee at the place of destination. To accomplish this it is necessary to secure service to unload trucks and, in some instances, to load same.

Truck drivers cannot perform this service for several reasons. Generally the driver has been operating the truck during the night hours and, upon arrival at destination, the driver must get some rest in order to prepare for the return trip later that day and, in addition, to comply with the ICC regulations requiring that a driver "log" off-duty time. If the driver participated in loading or unloading, he would not be off-duty. Perhaps of even greater significance is that the union contracts prohibit loading or unloading by the driver. Moreover, in certain of the larger markets, the personnel would forcibly restrain any driver seeking to perform this service as it would be contrary to provisions in labor contracts in the area of destination.

It is now universally recognized that "gypsy chasers" are used almost exclusively in loading and unloading trucks in this industry. There are, of course, instances in which the shipper loads the truck as a part of the shipper's contract but, for the purpose of this controversy, we may assume that the "gypsy chasers" are now an important cog in the trucking business.

To relate the method of operation "gypsy chasers" may be placed in three categories. Many of these men operate independently. Some places of business maintain a "house man" who is, in fact, a "gypsy chaser" stationed at the consignee's dock, and who may have one or more "gypsy chasers" working with him. The final category is referred to as a "big boy" who actually has several "gypsy chasers" working for him and, in turn, assigns the trucks to his workmen.

With respect to the "house man" at the place of business, such as Lummis Peanut Company in Philadelphia, the business concern makes an arrangement with the "house man" that only he and his friends may perform services at the dock of the particular business establishment. Presumably this assures more dependable service from men whose abilities are known to the particular business engaged in shipping or receiving cargo. Nevertheless, when plaintiff transports a cargo by truck to the dock of a business establishment where there is a "house man", plaintiff's truck driver must make arrangements to pay for unloading and the cash payment is made to the "house man". Customarily, in areas served by a "house man", the price for unloading the truck is fixed by union rules but the pay is by the job and not by the hour. This is true in both union and non-union areas. If the "gypsy chaser" is efficient and works rapidly, he may unload several trucks in one day. It is entirely dependent upon the energy and ability of the "gypsy chaser" as to the time consumed in completing the service.

The "big boy" runs a business for himself. He will generally pick up a number of trucks at the entrance to the market and, in turn, assign these trucks to his "gypsy chasers". Plaintiff's truck driver negotiates with the "big boy"; agrees upon a price for loading or unloading the truck; and subsequently pays the "big boy". Presumably the services of the "gypsy chaser" who performed the actual work were paid for by the "big boy".

Manifestly, to such an extent as the "gypsy chasers" working under a "house man" or "big boy" are involved, they are "captives". Plaintiff has no right of selection, no supervision and, while unnecessary to determine because of the conclusions herein reached, cannot in any sense be classified as employees of plaintiff.

The remaining category comprises the largest group of "gypsy chasers". The truck driver, from past experiences, knows where these "gypsy chasers" may be located and, as he approaches his destination, he is on the lookout for men to perform this service. Truck stops, entrances to tunnels, markets and other convenient locations provide suitable places for "gypsy chasers" to congregate. When the truck comes to a stop, it is approached by several "gypsy chasers".

Negotiations between the truck driver and "gypsy chasers" take place in non-union areas and, after agreement, the "gypsy chaser" rides the truck with the driver to the consignee's dock. He then takes the truck driver's ticket or bill of lading and approaches the dockmaster, advises the nature of the cargo and its source and inquires as to when the cargo may be unloaded. When space is available, the dockmaster so advises and the truck is brought to the dock.

Once the truck is brought to the consignee's dock, the driver climbs into the cab and goes to sleep. When the unloading is completed, the "gypsy chaser" gets a receipt from the consignee, knocks on the cab door, awakens the driver and requests his money. The truck driver pays the "gypsy chaser" with cash advanced to him by plaintiff, and the transaction is completed. At no time during the actual loading or unloading does the truck driver do anything other than sleep or, in some instances, he may leave the scene and return later. No tools or equipment are furnished by plaintiff or the truck driver.

It is the custom of the trade in most areas to "tip" persons who are full-time employees of others and who indirectly participate in loading and unloading at the dock. Plaintiff contends that a substantial portion of the sums paid for loading and unloading, aggregating $31,-516.49 for the year 1952 and characterized on plaintiff's tax return as "casual labor", would not be taxable in any event. We need not presently determine this question.

The foregoing facts are not materially disputed. Indeed, the sole question appears to be the application of these facts to the existing law. Stated otherwise, are these "gypsy chasers", or any of them, employees of the plaintiff within the meaning of 26 U.S.C.A. § 1426(d) (2) (1952 Ed.) covering social security taxes and 26 U.S.C.A. § 1621(c) (1952 Ed.) covering collection of income taxes at the source according to the Internal Revenue Code of 1939; the tax year in controversy being for the first quarter of 1952?

Through the maze of judicial decisions, annotations, law review articles and other comments, we learn that in realistically applying certain common-law tests we must look to the particular facts of each case. Such is the mandate of the Treasury Regulations.[1] While initially the term "employee" was given a broad definition which gave some indication that the common-law test of control should be subordinated to the test of "economic reality", United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757; Bartels v. Birmingham, 332 U.S. 126, 67 S. Ct. 1547, 91 L.Ed. 1947, Congress in 1948 defined the term "employee" in § 1426(d) (2) as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee".[2]

With respect to the Federal Insurance Contributions Act and the income tax withholding provisions, it is conceded that the employer-employee common law tests are the same. While we cannot agree with plaintiff that the Silk and Bartels decisions necessarily discarded the common law principles, it is certainly true that the emphasis of these judicial precedents was on "economic reality"

---

1. Regulation 128 (1939 Code), § 408.204.
   Regulation 116 (1954 Code), § 405.104.

2. In the words of Representative Gearhart:

   "If this Congress had not interfered, tens of thousands of people in America who never dreamed they were employed by anybody and never for one moment thought they were covered by social security or subject to payroll taxes would have found that they had been swept into the social security system by bureaucratic ukase. In other words, they would suddenly have found that they had more employers than a dog had fleas. So, to end this confusion, Congress acted promptly and, after thorough-going debate, by a vote of nearly 7 to 1, proceeded by legislation to put the matter in order once again by restoring the ancient doctrine of the common law defining the relation of master and servant, employer and employee."

and, as interpreted by the Treasury Regulations promulgated thereafter, Congressional action was deemed appropriate. The legislative and judicial history surrounding the employer-employee question is discussed at length in United States v. Thorson, 1 Cir., 282 F.2d 157, and Ringling Bros. Barnum & Bailey Combined Shows v. Higgins, 2 Cir., 189 F.2d 865.

█ It would unduly prolong this opinion to attempt to consider all of the authorities on the subject. An extensive annotation appears in 19 A.L.R. 1168. An analysis of the tests or factors to be considered are:

(1) The right to control and direct the individual performing the services, not only as to result, but also as to the details, manner, and means by which the result is accomplished.

(2) The manner of payment, by the job or by the hour.

(3) The right to discharge without cause.

(4) Furnishing of tools, equipment and place to work.

(5) Permanency of relationship and length of time of employment.

(6) Intention of the parties and their belief as to the relationship.

(7) Skill required.

(8) The offering of services to the general public rather than to one individual.

(9) Investment required and the opportunity for profit.

(10) Distinct occupation or recognized trade or calling involved.

(11) Custom in the trade.

(12) Whether the undertaking is a part of the business.

(13) The right of the person engaged to employ others to do the actual work and to make a profit from their employment.

█ Recognizing that it is impossible to lay down any hard and fast rule to determine whether a particular relationship is one of master and servant or contractee and independent contractor, we know that an independent contractor is generally defined as one who in rendering services exercises an independent employment or occupation and represents his "employer" only as to the results of his work and not as to the means whereby it is to be done. 56 C.J.S. Master and Servant § 3(2), p. 45.

██ At the outset we are confronted with a possible conflict of laws in determining the relationship of these "gypsy chasers". A contract of employment is governed as to its construction and effect by the law with reference to which the parties in good faith intended to contract, and a contract made without reference to the law of a particular place is governed by the law of the place where the contract was made. 56 C.J.S. Master and Servant § 5, p. 63. If the contract is made in one place, to be performed in another place, the law of the place of performance generally governs. We are told that during 1952 plaintiff used approximately 4000 different "gypsy chasers" and that each "gypsy chaser" unloaded trucks of about 400 different trucking firms during one year. It is difficult to believe that any reasonable application of the law relating to the handling of social security and withholding taxes was ever intended to cover approximately 1,600,000 different employer-employee relationships in one year. Moreover, as these relationships, whatever they may be, are governed by the laws and interpretations of 50 states, and as to plaintiff at least 32 states, one can readily see the maze of confusion that will exist by reason of any holding to the effect that "gypsy chasers" are employees of plaintiff under the usual common law rules.

Substantial reliance is placed by defendant upon two cases, Radio City Music Hall Corporation v. United States, 2 Cir., 135 F.2d 715, and Ringling Bros. Barnum & Bailey Combined Shows v. Higgins, supra. The Radio City case involved acts performed at Radio City Music Hall in the stage show. Ringling Bros. pertained to circus acts. The Sec-

ond Circuit held that those performing in Radio City Music Hall were not employees, but that the circus performers were employees. Only one salient distinguishing feature appears from the reading of these two cases. At Radio City, there were 117 different acts in a single year, each performing for a brief period of time with no permanency of relationship. In Ringling Bros. the circus acts, although not under long-term contract, had some actual permanency of relationship with some acts continuing for a number of years. Applying the test of permanency of relationship to plaintiff and the "gypsy chasers" it is clear that the Radio City Music Hall case should control. Indeed, it is highly improbable that the same "gypsy chasers" serve plaintiff's trucks more than once each year. The permanency of the relationship in Radio City, where the acts for the stage shows are changed each week, is far greater than the factual situation here presented.

The Government relies upon a line of authorities holding that persons unloading coal from railroad cars and other similar work are employees within the meaning of the law of torts.[3] In many of these cases the same man was used as an unloader over a period of many years, in the same locality, and under essentially a continuing contract. They generally reported to their employer at regular intervals, even though they did not have the benefits of "job security". They established a fixed pattern, at a fixed locale. Unlike the "gypsy chasers" the coal unloaders were intended to be employees even though performing labor on an intermittent basis. They were held out to the public as employees.

This pattern of operation is of some importance in determining the relationship of the parties. We know, for example, that the wages of longshoremen are subject to deduction by the stevedore for taxes, even though they are not carried on the stevedore's regular payroll at all times. Longshoremen, as members of a union, report to the hiring hall and are there sent out in gangs to stevedores for the purpose of loading and unloading vessels; during the course of a year longshoremen may work for eight or ten different employers. In each instance they are subject to the supervision and control of the stevedore. Once again we have a fixed pattern of operation combined with supervision and control, all pointing to support the employer-employee relationship.

It may be that plaintiff could be held legally liable for the negligent acts of these "gypsy chasers". As Judge Dobie said in Magruder v. Yellow Cab Co. of D. C., 4 Cir., 141 F.2d 324, 152 A.L.R. 516:

"It may well be that Yellow Cab is legally liable to passengers injured through the negligence of the drivers. If so (and we express no opinion on this question) this liability would be predicated upon the doctrine of estoppel, or a holding out to the public. It is even possible that there has been here a violation of Order No. 1059, Section 6 of the Public Utilities Commission of the District of Columbia: 'No public vehicle licensed under the provisions of Paragraph 31(D) of the Act of July 1, 1932, shall be operated by any person other than the owner of such vehicle or his duly authorized employee.' But we are told that no move has ever been made to enforce this provision against either Yellow Cab or its drivers. In any event, these considerations are in no way

---

**3.** Swift & Co. v. Alston, 48 Ga.App. 649, 173 S.E. 741; Holmes v. Railroad Co., 49 La.Ann. 1465, 22 So. 403; Muncie Foundry, etc., Co. v. Thompson, 70 Ind. App. 157, 23 N.E. 196; Chicago, R. I. & P. Ry. Co. v. Bennett, 36 Okl. 358, 128 P. 705, 20 A.L.R. 678; Murray's Case, 130 Me. 181, 154 A. 352, 75 A.L.R. 720; Decatur Ry. & Light Co. v. Indus-

trial Board, 276 Ill. 472, 114 N.E. 915; Benjamin v. Davidson-Gulfport Fertilizer Co., 169 Miss. 162, 152 So. 839; Maryland Casualty Co. v. Stewart, 74 Ga.App. 839, 41 S.E.2d 658; Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679, cert. den. 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426.

determinative of the actual relationship between Yellow Cab and its drivers; for the nature of that relationship stems from the contract between the parties."

In the Magruder case, the Fourth Circuit approved in principle the language of Judge Chesnut, the trial judge, where he pointed out the difficulties in administering the tax statutes and said (D.C., 49 F.Supp. 605, 611):

"While mere difficulty in the administration of the law is by no means conclusive, yet the uncertainties in the computation of the tax by reason of the particular conditions are at least some indication that it was not the intention of Congress to make the tax applicable in a situation of this kind."

The difficulties presented in plaintiff's collecting the tax from the "gypsy chasers" is far more apparent than in Magruder v. Yellow Cab Co. of D. C., supra. To obtain W-4 forms from each "gypsy chaser" or to deduct social security or withholding taxes from each payment made by each driver, constitutes an endless amount of bookkeeping although, since 1956, plaintiff has been following this procedure in order to protect itself from a possible decision that these "gypsy chasers" are employees.

Applying the test factors to the applicable facts, we turn initially to the matter of right of control—not as to the result but as to the details, manner and means by which the result is to be accomplished. That plaintiff's drivers were interested in the result cannot be denied. The closest approach we have to any possible exercise of control rests in the following testimony:

"Q. Let me ask you this: This man that you procure, suppose you find that he is misbehaving back in your cab, not unloading properly, what would you do?

"A. I would go back and see that he did it properly.

"Q. What if he still persisted in not unloading properly, would you get rid of him?

"A. Well, I never ran into it, but I imagine I would have."

This hypothetical situation is not persuasive in a final determination of the relationship. Plaintiff's drivers remain, nevertheless, interested in the results to be accomplished. To destroy an independent contractor relationship merely because the person so engaged is *obviously* doing an act which prejudices the result is not the power and right of supervision which points to the employer-employee relationship. To hold otherwise would create an employer-employee relationship in situations wherein the person engaged to do the work becomes intoxicated or otherwise damages the shipment. One need not entirely disassociate himself from active interest or supervision of the results as long as the details of the work, the physical management of instrumentalities used and the physical conduct of those engaged in the work are not under the control of the alleged employer or his authorized agent. In the instant case there was no retention of control and direction of the actual work of loading or unloading. The absence of any evidence of actual control may properly be considered in determining the existence of the right to control. The fact that the drivers were either asleep, or away from the scene, is most persuasive on the question of intent.

The manner of payment for the work done suggests that no employer-employee relationship was intended. The "gypsy chasers" are paid by the job—not by the hour. The rapidity with which the "gypsy chaser" adapted himself to the work was within his sole discretion. The Government urges that if a driver was late he would tell the unloader to put an extra man on and the driver would give him an extra $2.00 to get the truck unloaded fast. However, this portion of the testimony merely points out that a driver, in extreme cases, may retain the services of a "gypsy chaser" and helper. This portion of the contract is consummated at the time of the original hiring—not during the progress of the work itself.

The right to discharge with just cause has been previously discussed. We know of no rule of law which prohibits a contractee from terminating the contract of an independent contractor for misconduct or other obviously just cause. The evidence in this case points to no termination of any contractual arrangement and, indeed, no termination of the services of any "gypsy chaser". There is surely no indication of the right to discharge without contractual liability.

The total lack of any permanency in the relationship between plaintiff and the individual "gypsy chaser" has already been mentioned. The defendant does not contest this factor.

Prior to 1956 there was apparently never any contention that "gypsy chasers" were employees of trucking companies. When no W-4 form is obtained, no exception is allowed even for the employee. For this reason the tax involved in this controversy is substantially higher than if W-4 forms had been procured. Obviously plaintiff did not believe that these individuals were employees during 1952 and, while the evidence does not affirmatively reveal same, it is safe to assume that the Internal Revenue Department had a similar opinion. Nor do we believe that the individual "gypsy chaser" entertained the view that he had 400 separate employers in any one year.

To a limited extent skill is required in loading a truck, particularly one involving the shipment of food products. Admittedly no appreciable skill is required to unload a truck. As to this test there is little that can be drawn from the factual situation.

The "gypsy chasers" were available to the general public in the sense that they would serve any trucker seeking their services. They sometimes served several truckers during the same day. They bargained with the truck drivers for their services. Such facts tend to negate the thought of any employer-employee relationship.

On the issue of investment required and opportunity for profit, the Government has the advantage. No investment is required of the "gypsy chaser". The rate of approximately $15.00 for unloading a truck does not point to any "profit" as the term is generally used.

Agreeing with plaintiff, we feel that the class of persons known as "gypsy chasers" do form a recognized trade or calling. In offering their services to the trucking industry as a whole they come essentially within Regulation 116, § 405.104, subsection (c), which reads:

"(c) Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an *independent trade,* business or profession, in which they offer their services to the public, are not employees."

The independent trade is somewhat akin to that of the longshoreman whose taxes are deducted by the stevedore but not by the shipowner.

The custom of the trade points to the fact that other truck lines do not consider "gypsy chasers" as employees. Counsel are in agreement that this is in the nature of a test case and that no decision touching upon the status of "gypsy chasers" has been rendered to date.

We are in accord with the Government's contention that the work of unloading was a part of plaintiff's business. The trucking company was contractually obligated to deliver the cargo on the consignee's dock. This test is not, however, conclusive.

There can be no question but that the "gypsy chaser" had the right to employ others to do the actual work and, presumably, to make a profit thereby. As to the "big boys" this is precisely what they did. The same is essentially true as to the "house man". With respect to the individual "gypsy chasers", while the evidence does not reveal any instances in which this individual employed others to do the work, the right to do so existed as the truck driver, being asleep or away from the scene, was only interested in the results and the overall price of the job.

Analyzing these various tests, step-by-step, the conclusion is reached that only with respect to two factors does the Government prevail. The skill required is inconclusive; that the work to be done was a part of plaintiff's business is apparent; that no investment is required is admitted; and the opportunity for profit is *de minimis*. But as to the remaining tests it is clear that plaintiff must prevail. Considering the factual situation as a whole, we agree with Congressman Gearhart that Congress did not intend for "gypsy chasers" to have "more employers than a dog had fleas." Not unmindful of the difficulties presented to the taxing authorities in collecting taxes from "gypsy chasers", it is nevertheless apparent that this class of workmen was never intended, according to common law rules, to have 400 separate employers during each year.

Counsel for the plaintiff will prepare a judgment order in accordance with this memorandum.