LANIGAN STORAGE & VAN COMPA-
NY, Inc., Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 17341.

United States Court of Appeals
Sixth Circuit.

Feb. 17, 1968.

Elmer J. Kelsey, Department of Justice, Washington, D. C., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Anthony Zell Roisman, Attorneys, Department of Justice, Washington, D. C., on brief; Thomas L. Robinson, U. S. Atty., Memphis, Tenn., of counsel, for appellant.

John R. Stivers, Memphis, Tenn., Taylor Malone, Jr., Memphis, Tenn., on brief, for appellee.

Before O'SULLIVAN, CELEBREZZE and COMBS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

We review a decision of the United States District Court for the Western District of Tennessee, upholding the claim of appellee taxpayer, Lanigan Storage & Van Company, Inc., for refund of taxes. The cause was tried to the District Judge, Honorable Bailey Brown, who filed Findings of Fact and Conclusions of Law.

Appellee is a small trucking concern, operating out of Memphis, Tennessee, and engaged in long distance hauling of household furniture. It leases its several tractor-trailer vehicles to Allied Van Lines, Inc., and operates under Allied's interstate authority and nationwide dispatching system, employing, however, its

own drivers. Except at its home station at Memphis, Lanigan has no regular employees to do the necessary loading and unloading of its trucks at the various places around the country where its trucks begin and end the hauls assigned to appellee by Allied. This work of loading and unloading is accomplished by using men called "gypsy chasers," whose calling has no doubt grown out of the long distance truck hauling of household furniture and other cargo. Such men are usually available in the general area of the beginning and finish of such hauls. Their gathering places—gas stations, truck stops or other places of congregation—are apparently known to the truck drivers.

The Commissioner, upon review of appellee's tax returns, assessed, and appellee paid, the involved Social Security, unemployment insurance and withholding taxes upon the amount paid the loaders and unloaders for the years in question, 1959, 1960 and 1961, pursuant to the Internal Revenue Code of 1954, 26 U.S.C. §§ 3101 et seq., 3111 et seq., 3301 et seq., and 3402 et seq. Whether the District Judge was correct in awarding appellee a refund of these taxes depends on the answer to a single question: were the loaders and unloaders "employees" of the taxpayer as contemplated by the relevant sections of the Internal Revenue laws, or were they instead "independent contractors"?

▮ It is clear that resolution of this critical question had to be made by applying common law definitions of "employee" and "independent contractor." It was thought by some that by its decisions in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), the Supreme Court had decided that the meaning of "employee" as used in the tax statutes should not be controlled by the traditional common law rules, but by the "economic realities" of the relationship. However, in the years here involved, the pertinent statutes had been so amended as to make clear that the term "employee" will be read "under the usual common law rules" and does not include one who under such rules "has the status of an independent contractor." 26 U.S.C. § 3121(d) (2) and § 3306(i). See also Enochs v. Williams Packing Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).

We set out the following factual summary, distilled largely from undisputed testimony, which we deem relevant in assessing the correctness of the District Judge's finding that under the aforementioned common law rules, the here involved "gypsy chasers" enjoyed the status of "independent contractors" rather than "employees" of appellee.

When one of Lanigan's drivers is about to load or unload a truck, other than at Memphis, he contacts a local agent of Allied to see if Allied will obtain the needed help. Only in perhaps ten percent of the cases does Allied do so. If Allied does not do so, Lanigan drivers hire the men directly, or through a "job steward," "lot boss" or "big boy," as the leaders are variously denominated. The "gypsy chasers" are hired on a per job basis and are paid an hourly rate which, however, usually requires full pay for at least one full two or four hour period, and an additional period's full pay for fractions worked thereof. There was evidence that these "gypsy chasers" peculiar to appellee's activities are probably "moonlighters"—policemen, firemen, postal employees—who work at this trade in their off hours. In any event, they are thought of as quite reputable.

A single driver might engage as many as 500 of these "gypsy chasers" in a year. When the job is finished, the driver transports them back to the pickup point unless they have their own transportation. He pays them off at this time or, if he has secured help through an Allied agent, they are paid by Allied. The driver has the "gypsy chasers" sign "labor receipts." He requests their names, addresses and social security numbers. This information, when obtainable, is notoriously unreliable—the "gypsy chasers" evidently preferring often to give false names and social security numbers.

They may even be carrying several different social security cards.

Attempts to deduct withholding and social security taxes from the helpers' gross pay are sometimes made. These attempts are uniformly frustrated by the uncooperativeness of the "gypsy chasers" and their jealous regard for themselves as "independent contractors." One Lanigan driver described his dilemma in the following way:

"Q. Now, do you discuss with the shop steward the matter of Social Security tax and withholding of income tax in connection with the work of these men?

"A. We used to do it until we finally stopped after they never would accept it.

"Q. What was your experience in connection with that?

"A. Well, my experience with it once was that I like to get beat up about it.

"Q. Do they give you a reason as to why they will not permit you to withhold the Social Security or the income tax?

"A. They say they are their own contractors, that they take care of it themselves."

Referring to one such bad experience, this driver responded upon cross-examination by government counsel as follows:

"And the next few days I spoke to my boss about it and I told him I was going to leave it alone, because I just couldn't get killed about trying to collect some income tax."

The "gypsy chaser" is generally skilled in his work. One driver testified that "It takes a right smart of experience to carry furniture." In reply to the question, "How long do you think it would take to gain that experience?" he said:

"It all depends on how well, if you love that job.

"Q. I am very willing to learn. Do you mean to say in months—

"A. Well, I would say about six or eight weeks.

"Q. Six or eight weeks and I would be an expert, is that right?

"A. If you put real hard work into it."

The procedure for loading begins with the approach to the householder. The driver introduces himself as the foreman and the "gypsy chasers" as his helpers. He assures the shipper that the company wants to do a satisfactory job in all respects; he therefore requests special instructions at this time, such as whether a certain piece of furniture should be loaded in a position where it can be removed first on arrival. The next step is for the driver and the helpers to inventory the furniture. The driver marks the information down as they tag each item and relay to him descriptions of the type and condition of each piece. Before moving any furniture on dollies, "runners" (floor covers) must be placed. These runners are placed by either the driver or helpers, or both in cooperation.

The furniture is carried out to the truck by the "gypsy chasers" and into the van to the spot at which the driver is engaged in wrapping each piece with padding. He does the actual loading of the van himself, placing the furniture in tiers in such a way as to protect against a shifting of the load in transit. Sometimes he directs the loaders as to what items to bring, but generally they know through experience which pieces are needed at a particular time. If he has been given special instructions by the shipper out of the hearing of the "gypsy chasers" the driver relays the information to them; often the householder will direct the helpers in handling particular items of furniture. Unless he has engaged only one helper and, therefore, must assist him with the heavier pieces, the driver remains on the truck wrapping and stacking. He may go into the house to observe the remaining furniture, and in that case may pick up a light item to bring back himself; he may even assist in carrying back a heavy item.

Much the same division of labor attends the unloading operation. The following excerpts from the testimony of

James Lanigan, owner of appellee company, is descriptive of the process:

"Q. What does your driver do in connection with this activity after he has received instructions from the householder as to where the furniture should be placed?

"A. Well, he will return to the truck and do what we call 'break out the load.' He will take the tiers down and take the pads off the furniture and usually he has a ladder there, because the trucks are so high now. He works on a ladder, and if he has a large amount, one will assist him. If it is a big load, he will have two helpers, and they will carry the furniture in and place it where the owner says, and let me also say we have to spend a lot of time, because the owners change their minds. They may not like the sofa in one place, then it will have to be moved.

"Q. Your truck driver moves the truck to the destination, and then the helpers take out the furniture?

"A. Usually that is the case. If they have a heavy piece he may help move it out of the way.

"Q. Does he give the helpers instructions, the truck driver?

"A. I would say no. They know what they are doing."

In general, little supervision is exercised over the helpers by the driver. This results from several factors: the gypsy chaser is relatively skilled in his work and takes pride in it; there is a necessary division of labor between those operations performed by the driver on the truck and the actual moving of the furniture to and from the vehicle. Disciplinary measures including discharge are apparently within the power of the driver in an appropriate instance. Such measures, however, would appear to attend only the rare case.

The District Judge found "that the question whether these gypsy chasers were employees or independent contractors is a mixed question of fact and law to be determined by applying the common law test to the particular subsidiary facts of this case." He went on to say,

"The Court finds as a fact that the gypsy chasers were not employees of plaintiff during the years involved (McGuire v. United States, 349 F.2d 644 (9th Cir. 1965), Service Trucking Co., Inc. v. United States, 347 F.2d 671 (4th Cir., 1965), Bonney Motor Express, Inc. v. United States, 206 F. Supp. 22 (D.C.Va.1962), Restatement, Agency (2d) Sec. 220)."

We think that under the rule of Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) we must affirm the District Judge unless we can say that his basic finding was clearly erroneous under Fed.R.Civ.P. 52(a). In *Duberstein* the Court was considering whether the conduct there involved, the transfer of a Cadillac automobile, amounted to the making of a "gift" as that term is used in the income tax laws. The factfinder—there the Tax Court—had held that the alleged gift of the Cadillac was not such, but was compensation to the donee and, therefore, taxable as income. This Court reversed, Duberstein v. Commissioner of Internal Revenue, 265 F.2d 28 (1959), and in reversing us, the Supreme Court said:

"The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. Baker v. Texas & Pacific R. Co., 359 U.S. 227 [79 S.Ct. 664, 3 L.Ed.2d 756]; Commissioner [of Internal Revenue] v. Heininger, 320 U.S. 467, 475 [64 S.Ct. 249, 88 L.Ed. 171]; United States v. Yellow Cab Co., 338 U.S. 338, 341 [70 S.Ct. 177, 94 L.Ed. 150]; Bogardus v. Commissioner [of Internal Revenue], supra, [302 U.S. 34] at 45 [58 S.Ct. 61, 82 L.Ed. 32] (dissenting

opinion)." 363 U.S. 278, 289, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218.

The Court stated further that "the question here remains basically one of fact, for determination on a case-by-case basis," (Id. at 290, 80 S.Ct. at 1199) and emphasized our limited appellate review. "Where the trial has been by a judge without a jury [as in this case], the judge's findings must stand unless 'clearly erroneous.' Fed.Rules Civ.Proc. 52 (a). * * * The rule itself applies also to factual inferences from undisputed basic facts, id. [United States v. United States Gypsum Co., 333 U.S. 364], at 394 [68 S.Ct. 525, 92 L.Ed. 746], as will on many occasions be presented in this area." 363 U.S. at 291, 80 S.Ct. at 1200.

In Service Trucking Co., Inc. v. United States, 347 F.2d 671, 673 (4th Cir. 1965), where the issue was whether the involved "gypsy chasers" were employees within the meaning of the tax statutes, the Court held:

"In this situation we are required to affirm the judgment based upon the jury's resolution of the issue in favor of the Commissioner of Internal Revenue. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)."

In McGuire v. United States, 349 F.2d 644 (9th Cir. 1965) the status of unloaders under the tax statutes involved in this case was submitted to a District Judge who found as a fact that they were employees. The Fourth Circuit affirmed, citing Duberstein as requiring affirmance of the District Judge's findings, unless clearly erroneous. We are in accord with these cases in their determinations that under Duberstein the "clearly erroneous" rule of Fed.R.Civ.P. 52(a) governs our review of the District Judge's determination as to the status of the "gypsy chasers."

The "common law tests" mentioned in the Internal Revenue Code sections here involved, 26 U.S.C. §§ 3121(d) (2), 3306 (i), and 3401(c), are elaborated in corresponding sections of the Treasury Regulations, 26 C.F.R. §§ 31.3121(d)–1, 31.-3306(i)–1, and 31.3401(c)–1, which provide in substance the following:

"Generally such relationship [of employer-employee] exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, *an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done.* In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so." (Emphasis supplied.)

\* \* \* \* \* \*

"Whether the relationship of employer and employee exists will in doubtful cases be determined *upon an examination of the particular facts of each case.*" (Emphasis supplied.)

▪ As to the factor of "right to control," we think that while there is room for some disagreement on the issue, the facts of the instant case point basically away from the employer-employee relationship. Here the Lanigan drivers must "hire out" the loading and unloading phase of their operation to "gypsy chasers," often being required to go through an intermediary—a "lot boss" or "big boy"—and must pay the set rate of pay demanded, which includes minimums. These "gypsy chasers" are skilled in furniture handling, a skill which requires perhaps several months of concentrated effort to obtain. They are in a real sense "specialists" in their work, and do not require nor would they welcome, detailed supervision. They jealously consider themselves "independent." That the driver does not, in fact, exercise such control is not dispositive, but does tend to indicate that he does not possess the *right* to control. "The absence of any evidence of actual control may properly be considered in determining the existence of the right to control." Bonney Motor Express, Inc. v. United States, 206 F.Supp.

22, 28 (E.D.Va.1962). They are "subject to the will and control" of the appellee's drivers as to *what work to do*—what furniture to move and where—but the method and the means of actually performing the involved work is basically within their own control.

In United States v. Silk, supra, the Supreme Court said:

> "The Social Security Agency and the courts will find that *degrees of control* * * * permanency of relation and skill required in the claimed independent operation are important for decision. *No one is controlling* nor is the list complete." 331 U.S. at 716, 67 S. Ct. at 1469. (Emphasis supplied.)

And in Bartels v. Birmingham, supra, in dealing with whether the members of a "name band" should be considered as employees of the operator of a public dance hall, the Supreme Court, sustaining a District Court judgment holding that they were not, said:

> "The relations between him [the band leader] and the other members are permanent; those between the band and the operator are transient." 332 U.S. at 132, 67 S.Ct. at 1551.

We have noted that the factors of "control" and "skill" point toward "independent contractor" status for the "gypsy chasers." It is also obvious that the relationship here involved manifestly lacks the permanency characteristic of an employer-employee arrangement. We find this factor to be more than a little relevant to our ultimate determination here. The appellee did not carry a payroll, as such; the workers got none of the fringe benefits that today almost universally attend such a relationship. There was no collective bargaining. The evidence showed that a truck and its driver might be gone from Memphis for as long as six weeks or several months carrying out the hauls designated by Allied, and that possibly five hundred different "gypsy chasers" may have been used to unload appellee's four or five trucks in any one of the years in question. See Bonney Motor Express, Inc. v. United States, supra, 206 F.Supp. at 27.

Other factors to be considered are summarized in the Restatement (Second) of Agency § 220 (1958). Besides "control," "skill," and "permanency of relationship," the following matters of fact are listed as relevant:

> "(b) whether or not the one employed is engaged in a distinct occupation or business;
>
> "(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> * * * * * *
>
> "(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> "(f) the length of time for which the person is employed;
>
> "(g) the method of payment, whether by the time or by the job;
>
> "(h) whether or not the work is a part of the regular business of the employer;
>
> "(i) whether or not the parties believe they are creating the relation of master and servant; and
>
> "(j) whether the principal is or is not in business."

It is apparent that in no substantial degree can the above factors, taken in conjunction with others already mentioned, be said to point towards an employer-employee relationship for the here involved "gypsy chasers." The "gypsy chaser" is involved in a "distinct occupation"; his work is that of a "specialist"; and neither he nor the appellee believes he is creating the employer-employee relationship. And in any event, it is clear that as was pointed out in Service Trucking Co., Inc. v. United States, supra, 347 F.2d at 673, "the question of the unloaders' status is a debatable one, that is, one upon which reasonable men could differ." Accord, McGuire v. United States, supra, 349 F.2d at 646. "It is the total situation that controls." Bartels v. Birmingham, supra, 332 U.S. at 130, 67 S.Ct. at 1550.

The finding of the District Judge was not "clearly erroneous" and he offended no rule of law in his factfinding.

Judgment affirmed.