**REN–LYN CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 4:95 CV 1286.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 4, 1997.

---

Joseph D. DeSanto, Sr., DeSanto & DeSanto, Youngstown, OH, Jeffrey Cooper, Philadelphia, PA, for Plaintiff.

Gregory S. Nickerson, Department of Justice, Washington, DC, Annette G. Butler, Office of the U.S. Attorney, Cleveland, OH, for Defendant.

## MEMORANDUM OPINION

GALLAS, United States Magistrate Judge.

Plaintiff, Ren–Lyn Corporation (Ren–Lyn) initiated this action on June 9, 1995 pursuant to 28 U.S.C. § 1346(a)(1) seeking a refund of employment taxes in the amount of $124.58 and seeking cancellation of the assessments against it for Federal Insurance Contribution Act and Federal Unemployment Tax Act taxes, which had been assessed by the United States Internal Revenue Service for the years 1989 through 1991.

The court finds jurisdiction also exists under the Internal Revenue Code which reads:

(1) General rule.—No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

26 U.S.C. § 6532(a)(1)(1988). The United States counterclaimed for collection of taxes pursuant to 26 U.S.C. § 7401 and § 7402(a) alleging that this counterclaim has been authorized and requested by chief counsel of the Internal Revenue Service, a delegate of the Secretary of Treasury and presented at the direction of the Attorney General of the United States to enforce the March 7, 1994 assessments of $88,387.13 for Federal Insurance Contribution Act taxes and $32,114.44 of Federal Unemployment taxes less Ren–Lyn's alleged payment of $80.47.

Ren–Lyn was incorporated around December 1977, and before that the business was operated as a proprietorship. It is in the cosmetology business and hires the services of workers who have been designated as employees or independent contractors.

During the years 1989 through 1991 Ren–Lyn operated two beauty salons in the Youngstown area and employed managers, receptionist/bookkeepers, licensed cosmetologists and cosmetologist assistants. Also during this period it segregated its cosmetologists into two groups. The first group was treated as employees for tax purposes, whereas the second group was treated as independent contractors. Ren–Lyn withheld income taxes and paid the required FICA and FUTA taxes on the first group of cosmetologists and the other non-cosmetologist workers, including the filing of W–2 forms on these workers. The second group of cosmetologists were treated as independent contractors and the appropriate informational forms were filed including forms 1099.

The United States takes the position that Ren–Lyn is liable for the unemployment taxes on the cosmetologists whom had been designated as independent contractors. The FICA tax assessment was made in the amount of $88,387.13 and related to all four quarters of the years 1989, 1990 and 1991. The FUTA tax assessment was made in the amount of $32,114.44 and again related to the taxable years ending 1989, 1990 and 1991.

Under this dual system of hiring, cosmetologists were brought in most often as employees of the corporation, who after some period of time were offered a chair lease arrangement. This chair lease arrangement is completed by the execution of a "lease agreement" which is provided by Ren–Lyn. Pursuant to the lease agreement, they became members of the second group who leased chairs from Ren–Lyn, and Ren–Lyn was paid a percentage of "gross weekly receipts of Lessee, payable at the closing of Lessee's business every Saturday." This agreement further provided that receipts of the Lessee shall be tabulated on a cash register owned or maintained by Ren–Lyn or by an accounting method designed for similar business record keeping. The percentage of the gross receipts that the worker in the second group would retain varied from 50 to 65 percent. This rental fee was negotiable. The Lessee was required at his or her own expenses to supply all personal equipment and supplies including scissors, hand dryers, permanent rods, brushes, combs, rollers, spray nets and any additional equipment and products deemed necessary by the Lessee. In practice, Ren–Lyn would provide all chemical products including spray nets and permanent solutions and dyes at the Lessee's expense. Moreover, either party had the right to terminate the agreement upon 24 hours notice and the lease could not be assigned without the prior written consent of Ren–Lyn. The Lessee was also "if required" to obtain a managing cosmetologist's license and hold Ren–Lyn harmless from all claims of liability as a result of any intentional or negligent act committed by or on behalf of the Lessee. Finally, there were clear provisions in the chair lease to indicate that this was intended to be an independent contractor relationship. The lease agreement provided there was no

employer-employee relationship and that the Lessee was an independent contractor who would establish his or her own hours and appointments and further be responsible for the payment of his or her own federal, state and local income and self employment taxes. Moreover, many of the chair lease agreements submitted as exhibits by the United States indicate that the cosmetologists applied for and received their own federal employer identification numbers in addition to their social security numbers.

There are two types of cosmetology licenses in Ohio: the basic cosmetology license and the managing cosmetology license. The group of cosmetologists, who were designated by Ren–Lyn as employees, generally held a basic cosmetology license. Their work was subject to the direction of Ren–Lyn. Ren–Lyn assigned their hours, job duties, clients, and supplied all materials necessary for the performance of their jobs. These workers also at times were required to attend training sessions. They were paid an hourly wage rate on a bi-weekly basis.

However, the second group of cosmetologists, who were designated by Ren–Lyn as independent contractors, were individuals who primarily held managing cosmetology licenses and had their own keys to the salon. They set their own hours of work, set their own vacation schedules and could work for other salons or at their homes. They were not required to attend any training sessions and could perform whatever cosmetology services they desired. They also purchased their own supplies and on occasion would pay other cosmetologists to assist them. The customers generally paid the prices which were posted at the beauty salons regardless of whether the services were performed by a W–2 employee or an independent contractor. When Ren–Lyn conducted coupon promotions which lowered prices, the lowered prices applied only to "selected designers". These were cosmetologists who were the W–2 employees of Ren–Lyn. Ren–Lyn did not require the independent contractor cosmetologists to lower their prices for these promotions. However, the W–2 employee cosmetologists and the independent contractors performed essentially the same duties of

shampooing, hair cutting, hair coloring, giving permanents, sanitizing tools, cleanup of the work areas and answering the phones. Also appointments for all cosmetologists were made through Ren–Lyn's receptionists. All cosmetologists were required to inform the receptionist if they were not coming in as scheduled, and the receptionist would call customers to either reschedule, cancel, or reassign them to another cosmetologist. The independent contracting cosmetologists, though, were able to reschedule their own appointment times for their customers. Further there were W–2 employees who held managing cosmetologist's licenses, and there was one instance of an independent contractor cosmetologist who held only a basic license. Therefore there was no clear segregation of workers based upon the type of license held. Moreover, if the independent contracting cosmetologist utilized one of the W–2 employees for shampoo or assistance, Ren–Lyn would charge for its employee's services.

Under the Internal Revenue Code, employers must pay taxes on employee wages under the Federal Unemployment Tax Acts and one-half of the employee tax liability under the Federal Insurance Contribution Act. These taxes have been collectively referred to as employment taxes. *Halfhill v. United States,* 927 F.Supp. 171, 174–75 (W.D.Pa.1996); *Hospital Resource Personnel, Inc. v. United States,* 68 F.3d 421, 424 (11th Cir.1995). However, employers need only send forms 1096 and 1099 to the Internal Revenue Service concerning workers who are independent contractors, which indicate the workers' identities and the amount of payment to each worker. *Halfhill,* 927 F.Supp. at 175. A worker who is an independent contractor is responsible for payment of FICA taxes, rather than the employer, and there is no FUTA tax for this type of worker. The employer-employee relationship:

> "[g]enerally ... exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done." *United States v. Silk,* 331 U.S. 704, 714 n. 8, 67 S.Ct. 1463, 1469 n. 8, 91 L.Ed. 1757 (1947).

*Erickson v. Commissioner of Internal Revenue,* 172 B.R. 900, 910 (Bankr.D.Minn.1994), 26 C.F.R. § 31.3401(c)–1.

Moreover the applicable federal regulation, 26 C.F.R. § 31.3401(c)–1 states:

> In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

■ The parties have stipulated and requested that the court resolve the dispute first under § 530 of the Internal Revenue Act of 1978 which provides a "safe harbor" for employers who mistakenly claim that their employees are independent contractors. Section 530 was enacted to curb what Congress perceived was overzealous Internal Revenue Service tax collection activity. *Boles Trucking, Inc. v. United States,* 77 F.3d 236, 239 (8th Cir.1996); *In re Rasbury,* 141 B.R. 752, 761 (Bankr.N.D.Ala.1992). It provides that a worker shall not be deemed to be an employee unless the taxpayer had no reasonable basis for not treating the worker as an employee. *Darrell Harris, Inc. v. United States,* 770 F.Supp. 1492, 1497 (W.D.Ok.1991).

> The essence of the safe harbor provision is to grant protection to the taxpayer who has consistently treated workers as independent contractors but has not been previously challenged by the IRS. In effect, where the taxpayer's filings have put the IRS on notice and the IRS has not acted without delay, the taxpayer must be shielded from the compounding effects of the error.

*Erickson v. Commr. of Internal Revenue,* 172 B.R. at 912. Pursuant to § 530, if an employer did not treat an individual as an employee, and all federal tax returns were filed relating to such individual as an independent contractor, then "the individual shall be deemed not to be an employee unless the [employer] had no reasonable basis for not

treating such individual as an employee." The statute provides three "safe harbors" which are: (1) judicial precedent, published rulings, technical advice or letter rulings to the taxpayer; (2) past favorable IRS audits on the same issue; or (3) long-standing industry practices. 26 U.S.C. § 3401 note § 530(a)(2). Ren–Lyn's evidence includes a prior audit of employer withholding for form 941's for the year 1976. Although the business changed from a proprietorship to a corporation in 1977, the taxpayer may rely on the results of this audit as the audit of the predecessor. *Lambert's Nursery & Landscaping, Inc. v. United States,* 894 F.2d 154, 155 (5th Cir.1990). Ren–Lyn also raises favorable findings from the Ohio Bureau of Employment Services from 1991 concerning Ren–Lyn as a corporate entity. However, these do not constitute an IRS audit and therefore have no relevance.

The initial focus in this matter is on whether Ren–Lyn's treatment was consistent as required by § 530(a)(1). The parties stipulated as follows:

> The parties hereby stipulate and agree that plaintiff is entitled to relief under the provisions of Section 530 of the Internal Revenue Act of 1978 if the court determines that plaintiff has established, by a preponderance of the evidence, the requirement of section 530(a)(3) of the Internal Revenue Act of 1978 as amended, i.e., that subsequent to December 31, 1977, it did not treat any individual holding a substantially similar position (to those individuals who plaintiff treated as independent contractors) as an employee for employment tax purposes.

Under § 530(a)(3), consistency in treatment of individual workers is defined as follows:

> (3) **Consistency required in the case of prior tax treatment.**—Paragraph (1) shall not apply with respect to the treatment of any individual for employment tax purposes for any period ending after December 31, 1978, if the taxpayer (or a predecessor) has treated any individual holding a *substantially similar position as* an employee for purposes of the employment

taxes for any period beginning after December 31, 1977. (*emphasis supplied*).

Pursuant to § 530(a)(1) and § 530(a)(3) the employer taxpayer must consistently treat an individual as a non-employee, and the safe harbor is denied when the employer "has treated any individual holding a substantially similar position as an employee ... for any period ... after December 31, 1977." Thus, the safe harbor requires both consistency as to the same worker and consistency among different workers holding substantially similar positions. *Nash v. United States,* 76 AFTR 2d 95–7920, 95–2 USTC 50,617, 1995 WL 655588 (E.D.Pa. Nov.7, 1995). The evidence presented by both Ren–Lyn and the IRS showed that the jobs performed by the cosmetologists were basically the same and the differences in duties were *de minimus.* All workers' primary duties never changed and those duties were hair cutting, hair coloring, giving permanents and manicures, cleaning the immediate work area and answering the telephone. The chair lease cosmetologists were only freed from shampooing and general cleanup of the shop. The fact that their jobs were substantially similar positions is reinforced by the evidence that it was a simple matter for a worker to opt to work under a chair lease arrangement. There is no evidence that Ren–Lyn ever denied a worker's request, and in fact there were several instances in 1986 where workers were treated both as W–2 employees for part of the year and, after agreeing to a chair lease, they were treated as independent contractors for the remainder of the year.

Consistency under § 530(a)(3) is viewed from the standpoint of job duties to determine what is a substantially similar position. See *Halfhill,* 927 F.Supp. at 176; *Lowen Corp. v. United States,* 785 F.Supp. 913, 915–16 (D.Kan.1992), *aff'd. sub norm. Eastern Investment Corp. v. United States,* 49 F.3d 651 (10th Cir.1995); *In re Compass Marine Corp.,* 146 B.R. 138, 156 (Bankr.E.D.Pa. 1992). For example, in both *Halfhill* and *Lowen Corp.* the job duties of the truck drivers and salespersons, respectively, entailed substantially similar duties, yet the workers were inconsistently designed as em-

ployees or independent contractors, thereby defeating protection under § 530's safe harbor.

Viewed from this standpoint, Ren–Lyn does not prevail under § 530(a)(3), because it designated workers as employees after December 31, 1977 who held substantially similar positions as those workers who were designated as being independent contractors. Ren–Lyn does not prevail on this issue under the stipulation. Moreover had the court considered the inconsistent treatment of several individual workers as both employees and independent contractors under § 530(a)(1), there would have been another basis on which Ren–Lyn would not have prevailed.

■■■■ Consequently, the court must now consider Ren–Lyn's arguments that the workers whom it designated as independent contractors were not employees for purposes of FICA, (26 U.S.C. § 3121(d)) and FUTA (26 U.S.C. § 3402) which define employees under "usual common law rules applicable in determining the employer-employee relationship". In the Sixth Circuit, the following nine factor test has been utilized to determine whether a worker is an employee or an independent contractor.

(a) Control, skill and permanency of the relationship;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

.    .    .    .    .

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Lanigan Storage & Van Co. v. United States,* 389 F.2d 337, 342 (6th Cir.1968); *Henry v. United States,* 452 F.Supp. 253, 254 (E.D.Tenn.1978) (applying test to beautician chair lease arrangement). Moreover, as explained more recently in *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), when Congress refers to an employee relationship under the common law, the United States Supreme Court will determine the term "employee" to incorporate the general common law of agency rather than the law of any particular state. *Id.,* 503 U.S. at 323 n. 3, 112 S.Ct. at 1348 n.3, 117 L.Ed.2d at 589 n. 3; *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989). Because the statutory definition refers directly to the "usual common law rules" the court will defer to *Darden and Lanigan Storage's* use of Restatement (Second) of Agency in formulating the proper test, rather than the test promoted by the IRS in its Revenue Ruling 87–41.[1] The general *Darden* factors of determining common law agency employee-employer relationship are: (1) right to control the manner or means, (2) skill required, (3) source of the instrumentalities and tools, (4) location of work, (5) duration of the relationship, (6) ability to assign additional projects to the worker, (7) workers' discretion over working hours, (8) method of payment, (9) worker's role in hiring and paying assistants, (10) whether work was part of regular business of the employer, (11) whether the employer is in business, (12) the provision of employee benefits, (13) and tax treatment of the hired party. There is much congruity

---

1. The IRS' test includes the right of termination. This factor, though, is not determinative of either the employee-employer relationship or of an independent contractor arrangement because it is not unique to either one. In fact the right of termination exists in many types of relationships including the marital relationship.

between the *Darden* factors and those in *Lanigan Storage.* However, one factor mentioned in *Lanigan Storage* and the Restatement (Second) of Agency which is not addressed in *Darden*, but the court believes is important, is whether the work constitutes a distinct occupation or business. Therefore, the court will now proceed to adjudicate the issue whether or not the Ren–Lyn workers were properly classified as independent contractors based on the applicable common law rules.

1. *Control of Manner and Means*

The IRS found in its form 886–A explanation of items (Ren–Lyn Exhibit 1) that the cosmetologists performed "in accordance with the requests made by the clients," but that Ren–Lyn had trained the cosmetologists. This issue of control of cosmetologists and barbers in the chair lease arrangement is a difficult issue as evidenced by the cases and revenue rulings listed in 51 ALR Fed. *Taxes Withholding—Employees* § 76 dealing with barbers, beauticians or manicurists. The United States cannot point to any clear legal precedent on this issue. Nevertheless, when viewed with respect to Ren–Lyn's control of the manner and means of performing services, it is clear that Ren–Lyn had very little control. Granted Ren–Lyn did train many of these workers prior to their becoming independent contractors. However, the evidence shows that once an individual became a chair lease cosmetologist, the workers had control over the manner and means of providing services to their respective customers. Ren–Lyn controlled only the result and not the means and method. *See* 26 C.F.R. § 31.3401(c)–1. The chair lease cosmetologists could use supplies furnished by Ren–Lyn for a fee as a matter of convenience, but they were also free to use their own supplies. Moreover, when a customer believed the work was performed unsatisfactorily, Ren–Lyn had a policy that its employee cosmetologists were to perform the services again for free. However, there was no such policy with respect to a chair lease cosmetologist, and handling the disgruntled client was completely in the hands of a chair lease cosmetologist.

A chair lease cosmetologist could choose the type of services to be performed, such as nail and manicure work, without performing the other services related to hairstyling. Ren–Lyn had no control over what services the chair lease cosmetologists would perform, other than that the services would relate to the "result" of beauty salon services. Although many of the facts in this case bear a striking similarity to those involving cosmetologists in *Wolfe v. United States,* 570 F.2d 278 (8th Cir.1978), it cannot be overlooked that in *Wolfe* the court used the Second Circuit's criteria for determining an employer-employee relationship. The United States has proposed the Second Circuit's criteria to this court, but this court must follow the criteria of the Sixth Circuit and especially those of the Supreme Court in *Darden.* Therefore *Wolfe,* while factually similar, contains legal conclusions based on different criteria, which are not binding on this court. Because Ren–Lyn exercised little control over the manner and means of its chair lease cosmetologists, this factor supports independent contractor status.

2. *Skill* :

The work was skilled, as evidenced by Ren–Lyn's training, thus supporting independent contractor status.

3. *Source of Instrumentalities and Tools:*

The major items such as the chair and basin in the workplace were provided by Ren–Lyn. The tools supplied by the independent contractor such as scissors, hand dryers, curlers, brushes, combs, permanent rods, spray nets and chemical products were relatively insignificant in comparison to Ren–Lyn's investment. Ren–Lyn argues that the chair lease cosmetologist rented the workplace and thus had a significant investment. However, given that the chair lease had no element of fixed cost, there was no potential for loss on this alleged investment. This factor favors an employee relationship.

4. *Location of Work:*

Services performed by Ren–Lyn were performed at one of its two beauty parlors. Although the workers could work elsewhere,

and in rare situations did, the workers performed services for Ren–Lyn at locations selected by Ren–Lyn. This factor favors an employee relationship.

### 5. Duration of the Relationship:

The chair lease cosmetologists worked continuously for Ren–Lyn for many years. This factor favors an employee relationship.

### 6. Ability to Assign Additional Projects:

Ren–Lyn had some control over this through the direction of its receptionist of "walk-in" customers. The receptionist could direct these customers to any cosmetologist. The chair lease cosmetologist had the right of refusal. In the converse, though, the receptionist could deny additional projects by referring the customers to another cosmetologist. Thus, Ren–Lyn had some control over the amount of work a chair lease cosmetologist could perform. Nevertheless, Ren–Lyn could not assign new responsibilities to the chair lease cosmetologists. Taken together, this factor is neutral and favors neither position.

### 7. Workers' Discretion Over Working Hours:

The chair lease cosmetologists had control over their hours. They had keys to the shop and were free to come and go as they pleased. Their only obligation was to fill out a schedule book so the receptionist would know what hours they were working during any given week. This factor favors independent contractor status.

### 8. Method of Payment:

As Lanigan Storage points out, the key is whether the worker is paid by time or by the job. Id., 389 F.2d at 342. The chair lease cosmetologists were paid by the job, thus favoring independent contractor status.

### 9. Workers' Role in Hiring Assistants:

The chair lease cosmetologist could hire another for assistance and Ren–Lyn had no control over this. The IRS argues that the assistants were hired by Ren–Lyn, but the fact that chair lease cosmetologists usually selected one of Ren–Lyn's employee cosmetologists to assist is not equivalent to control. The chair lease cosmetologist could also "hire" another chair lease cosmetologist for assistance. Moreover, the chair lease cosmetologists were responsible for paying assistants. This factor favors independent contractor status.

### 10. Integration of Business:

Whether the worker was part of the regular business of Ren–Lyn must clearly be resolved in favor of the United States. This factor favors an employee relationship.

### 11. Principal in Business:

Ren–Lyn was clearly "in business" supplying hair styling services to customers and used the chair-lease cosmetologists to accomplish this end. This factor favors an employee relationship.

### 12. Employee Benefits:

The chair lease cosmetologist did not receive any pension, insurance coverage or other employee benefits. This factor favors independent contractor status.

### 13. Tax Treatment and Parties Intent:

Tax treatment is one of the Darden factors, which is also the ultimate issue in this case. However, Ren–Lyn's use of 1099's and the chair lease agreement terms clearly specify that the intent was to create an independent contractor relationship. The chair lease cosmetologist was responsible for obtaining Workers' Compensation insurance and liability insurance and was to hold Ren–Lyn harmless from any liability due to accident or injury sustained by both the chair lease cosmetologist or the customer. This is further supported by the evidence that several chair lease cosmetologists obtained federal employee identification numbers for use in their business. The United States uncovered an instance where there was no written lease agreement for a cosmetologist who was treated as an independent contractor for tax purposes. But given the common elements of lack of control and the other factors, the existence of an oral agreement rather than a

written agreement is not significant. This factor favors independent contractor status.

### 14. *Distinct Occupation:*

This factor from *Lanigan Storage,* was not clearly addressed in *Darden,* but it certainly is important. The evidence that the State of Ohio licenses this occupation demonstrates that cosmetologist is a distinct occupation and thus favors independent contractor status.

Each criterion of the common law employment test must be assessed and weighed with no one factor being decisive. *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. at 325–27, 112 S.Ct. at 1349–50, 117 L.Ed.2d at 590; *Eastern Investment Corp. v. United States,* 49 F.3d 651, 653 (10th Cir.1995). Of these 14 factors, five favor an employer-employee relationship, eight favor independent contractor status and one factor, the sixth, is neutral. However, the first factor (the factor of control) appears to carry the most weight in light of the pertinent IRS regulation. Granted the facts presented show that Ren–Lyn's operations do.not fit within the circumstances of *Henry v. United States,* where each cosmetologist made her own appointments, collected her own fees and kept her own records in addition to being responsible for the kind of work performed. *Id.,* 452 F.Supp. at 255. Ren–Lyn, in effect, controlled the prices to be charged by the chair lease cosmetologist generally, and performed bookkeeping and scheduling to some degree; it did not, however, direct the chair lease cosmetologists in the performance of their duties for customers, nor have a right to schedule work or set hours contrary to the wishes of the chair lease cosmetologists. Therefore, it appears as in all barber and beautician cases, this is another close case, but Ren–Lyn has carried its burden. The United States is therefore ordered to cancel the FICA and FUTA taxes erroneously assessed and the United States' counterclaim is denied and dismissed. However, after reviewing the evidence, the court finds that Ren–Lyn has failed to produce sufficient evidence of partial payment to establish entitlement to a refund on its complaint.

### CONCLUSION

Following trial on the complaint and counter-claim, the court finds that plaintiff Ren–Lyn Corporation has failed to demonstrate that it made an erroneous tax payment on the assessed FUTA and FICA taxes to the IRS, as alleged in the complaint. However, Ren–Lyn Corporation does prevail in its request for cancellation of the assessments of the FUTA and FICA taxes for the years 1989 through 1991 and Ren–Lyn has overcome the government's counterclaim. Accordingly, judgment must be entered for Ren–Lyn for the cancellation of the assessed taxes and against the United States on its counterclaim.