T.C. Memo. 2010-239


UNITED STATES TAX COURT


CHERYL A. MAYFIELD THERAPY CENTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ARDMORE DAY SPA, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9156-07, 9157-07.    Filed October 28, 2010.


       Massage therapists, cosmetologists, and nail
technicians (service providers) operated on the
premises of Ps' spa.  Ps generally charged each service
provider weekly "booth rent" equal to the greater of
approximately $80 base rent or 25 percent of the
service provider's gross revenues.  Ps contend that
they had a landlord/tenant relationship with the
service providers.  R determined that the service
providers were Ps' employees.  <u>Held</u>:  The service
providers were independent contractors.


<u>Edith F. Moates</u>, for petitioners.

<u>Denise G. Dengler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Petitioners have brought these actions for redetermination of employment status pursuant to section 7436.[1] In a notice of determination of worker classification dated February 15, 2007, respondent determined that for 2002 petitioner Cheryl A. Mayfield Therapy Center (the therapy center) owed employment taxes of $20,473 and additions to tax under sections 6651 and 6656 of $4,607 and $1,211, respectively.  In a separate notice of determination of worker classification dated February 21, 2007, respondent determined that for 2003 and 2004 petitioner Ardmore Day Spa, Inc. (the corporation), owed employment taxes, additions to tax, and penalties as follows:

|                          | 2003     | 2004     |
|--------------------------|----------|----------|
| Employment taxes         | $34,509  | $29,895  |
| Sec. 6651 addition to tax| 4,627    | 4,079    |
| Sec. 6656 addition to tax| 2,181    | 1,921    |
| Sec. 6662 penalty        | 2,789    | 2,353    |

The issue is whether respondent properly classified certain massage therapists and cosmetologists as petitioners' employees.

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein by this reference.  When they filed their petitions,

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure. All figures are rounded to the nearest dollar.

Cheryl A. Mayfield (Ms. Mayfield), who is the sole proprietor of the therapy center, resided in Oklahoma, and the corporation had its principal place of business in Oklahoma.

Ms. Mayfield is a licensed massage therapist. During 2002 she operated the therapy center and a massage school at separate locations in Ardmore, Oklahoma. At the beginning of 2003 she combined these business activities in the corporation, of which she was the sole shareholder. (Hereinafter we sometimes refer to the therapy center's and the corporation's operations collectively as the spa.)

Ms. Mayfield originally operated the spa out of a three-bedroom house, which she partitioned to create four massage rooms, one of which had two massage tables. In August 2003 the spa moved to a larger building with about 12 massage rooms. The facilities at each location included a reception area in the front and workstations for cosmetologists and nail technicians. (Hereinafter we refer to the cosmetologists and nail technicians collectively as cosmetologists and sometimes refer to the cosmetologists, nail technicians, and massage therapists collectively as service providers.)

The aggregate number of service providers (not counting Ms. Mayfield) operating part or full time on the spa's premises during each year at issue were:

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Massage therapists | 10 | 16 | 15 |
| Cosmetologists | 3 | 8 | 4 |

During any given week, however, there were generally fewer service providers operating at the spa than indicated by these numbers, which reflect turnover during the year.  During 2002, for instance, and until the spa moved to its larger quarters in August 2003, there were no more than five massage therapists (not counting Ms. Mayfield) operating at the spa during any given week and no more than two cosmetologists.  During each year at issue the spa employed one or more receptionists; during 2003 and 2004 the spa also employed a massage instructor.

Although some of the service providers operated at the spa for several years, others had only a short-term relationship with the spa.

The service providers received no set salary or wages and no fringe benefits.  As a general rule, the spa charged each service provider weekly "booth rent" equal to the greater of approximately $80 "base rent" or 25 percent of the gross revenues the service provider generated that week.  But the spa's practices varied.  Sometimes the spa did not charge the full amount of booth rent, especially for a new or part-time service provider.  If a service provider was absent from the spa for the entire week, the spa might forgo booth rent, although on occasion

it charged the absent service provider "base rent" and withheld it from the next weekly check.

The service providers set their own hours. Some of them worked full time; others were part-time workers who were students or had jobs elsewhere. At least one part-time worker was present at the spa only when he had scheduled appointments. Other service providers spent time at the spa even when they did not have appointments.

Petitioners had written agreements with some service providers, at least for some years at issue, but not with others. Although the agreements are not in evidence, the testimony of one of the service providers indicated that the agreements essentially indicated the service provider's schedule for the coming year. Similarly, service providers without written agreements generally gave the spa advance notice of the days and hours they planned to be at the spa. But the service providers often altered their schedules as they chose and were free to leave the spa during the hours they had scheduled for themselves. Ms. Mayfield would work at the spa when no other service providers were there. During 2002 the spa was open 6 days a week and later posted operating hours 7 days a week. The hours during which the spa was actually open, however, depended upon whether any service provider or Ms. Mayfield was available to work. Most of the service providers had keys to the spa and could come into

the spa for appointments outside of the spa's normal business hours.

Clients made appointments for spa services at the receptionist's desk.  A receptionist or Ms. Mayfield generally answered the telephone, or if they were unavailable, one of the service providers would answer it.  If the client requested a particular service provider, the request was honored.  If the client requested no particular service provider, the receptionist would rotate scheduling among available service providers.  A service provider could decline servicing any particular customer.  When coming to the spa for the first time, a new client would sign a waiver of liability and fill out an information sheet listing his or her name and address and any health issues.  The spa kept these forms at the receptionist's desk and made them available to the service providers to review.

The spa posted prices for various spa services on brochures and on its Internet site.  But the service providers were not required to charge these posted prices; they often charged less and occasionally provided free services for repeat customers, family, and friends.

The spa offered discounted prices for clients who prepaid for packages of services, e.g., for eight massages.  Any massage therapist who honored these specials could give massages to the clients who prepaid for the discounted services.  The service

providers sometimes got together and designed "specials", which were then offered by the spa.  Ms. Mayfield started the practice of offering her clients a card that gave them a free massage after 10 paid massages for a certain rate.  Some of the other massage therapists also offered this card, but others decided not to offer it.  The spa also sold gift certificates and offered "spa parties", sometimes offsite, at which spa services were provided to a group of customers for a single price, invoiced by the spa and divided among the participating service providers.  A service provider's participation in "spa parties" was voluntary.

Clients paid for services at a central point as they left the spa.  The spa accepted payment by cash, check, gift certificate, or credit card.  Cash payments were kept in a wicker basket beneath the receptionist's desk.  When low on funds, a service provider would sometimes take money from the basket and leave a handwritten note; the borrowed cash would then be deducted from the service provider's weekly check.

Each cosmetologist generally provided her own supplies, such as shampoo, conditioner, hair dye, combs, brushes, curling irons, and scissors.  Each massage therapist also generally provided his or her own supplies, such as massage oils, creams, salt scrubs, hot stones, towels, and sheets.  Some types of supplies, such as massage oils, the massage therapists generally purchased from the

spa, which bought them in bulk.  They sometimes bought other supplies from outside sources.

Each massage therapist generally had an assigned room.[2]  In at least some instances, the massage therapists decorated and fitted out their assigned rooms with massage tables, lamps, shelves, stereos, and other items procured at their own expense.[3] When the spa was at its original location, there were sometimes more massage therapists than massage rooms available.  In those circumstances, massage therapists who had their own rooms would sometimes permit other massage therapists to use their rooms if the rooms happened to be free.[4]

Service providers initially wore scrubs to work at the spa. During 2002 they collectively decided to wear shirts with the spa logo and either khaki, black, or white slacks or shorts.  This practice continued during 2003 and 2004.  Each service provider purchased his or her own work clothing.

---

[2]The record is vague as to whether cosmetologists had assigned working areas.

[3]For instance, one massage therapist testified that when she took a room at the spa, she purchased a massage table, hot stones, cabinets, and a mural for the room and brought in her own stereo, lamps, greenery, water fountain, and decorations.  When she later moved to a larger room at the spa, she had her husband build a full wall unit of shelves for the new room.

[4]One massage therapist testified that she never allowed anyone else to use her massage room.

Massage therapists are required to have a license from the City of Ardmore. Cosmetologists are required to have a State license. The service providers paid for their own training school, licenses, and continuing professional education. Many of the massage therapists initially received their training from the massage school Ms. Mayfield operated. These students paid the regular fees charged by the massage school, and there was no guarantee or obligation that massage school students would work at the spa after graduation. Sometimes a new service provider would be paired with a more experienced service provider for observation and training as to particular types of services.

Each week the spa would prepare payout sheets for the service providers. These payout sheets listed each service provider's clients and the total amount that each client paid for services rendered. From these amounts the spa would deduct booth rent, expenses for products the service providers might have purchased from the spa, and any amount that the service provider might have taken from the basket money. Each week, the spa would write the service providers checks for the net amounts due them.

Petitioners did not file Forms W-2, Wage and Tax Statement, with respect to any individuals listed in the notices of determination. Petitioners also did not report any compensation payments to employees during the years at issue on Forms 941,

Employer's Quarterly Federal Tax Return, or Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return.[5]

In the notices of determination respondent classified as employees the receptionists, massage therapists, and cosmetologists who worked at the spa during 2002 through 2004 and an instructor who worked at the massage school during 2003 and 2004.

## OPINION

Petitioners concede that the receptionists and the massage instructor listed in the notices of determination are employees.[6] Petitioners contend, however, that respondent improperly classified the service providers (i.e., the massage therapists and cosmetologists) as employees. Petitioners acknowledge that they have the burden of proof. See Rule 142(a); Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001).

For purposes of employment taxes, the term "employee" includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has

---

[5]For some periods petitioners did not file such forms, and for other periods petitioners filed such forms reporting zero payments to employees.

[6]Petitioners do not contend that, with respect to these employees, they are entitled to "safe harbor" relief under the Revenue Act of 1978, Pub. L. 95-600, sec. 530, 92 Stat. 2885, as amended, nor do they dispute, with respect to these employees, the application of penalties and additions to tax as determined in the notices of final determination. We deem petitioners to have waived any such arguments.

the status of an employee". Sec. 3121(d)(2). Under common law rules, the most important consideration in determining an employer-employee relationship is generally whether the person for whom the services are performed has the right to direct and control the method and manner in which the work is to be done. See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Marvel v. United States, 719 F.2d 1507, 1514 (10th Cir. 1983); Leavell v. Commissioner, 104 T.C. 140, 149-150 (1995).

The Internal Revenue Service has identified these 20 factors for determining the existence of an employment relationship in various tax law contexts: (1) The putative employer's right to require compliance with instructions; (2) training by the putative employer; (3) integration of the worker's services into business operations; (4) a requirement that the worker's services be rendered personally; (5) the putative employer's hiring, supervising, and paying assistants; (6) a continuing relationship; (7) set hours of work; (8) a requirement that the worker devote substantially full time for the putative employer rather than being free to work when and for whom he or she chooses; (9) doing work on the putative employer's premises; (10) requiring the worker to perform services in the order or sequence set by the putative employer; (11) requiring the worker to submit oral or written reports; (12) paying by the hour, week, or month, rather than by the job or on a straight commission; (13) paying

business and travel expenses; (14) furnishing tools and materials; (15) a lack of significant investment by the worker; (16) an absence of ability by the worker to realize a profit or suffer a loss; (17) working for no more than one firm at a time; (18) the worker's not making his or her services available to the general public on a regular and consistent basis; (19) a right to discharge the worker; and (20) a right by the worker to terminate the relationship without incurring liability.  Rev. Rul. 87-41, 1987-1 C.B. 296, 298-299.  The Court of Appeals for the Tenth Circuit, to which any appeal of this case would lie, has endorsed applying these 20 factors.  E. Inv. Corp. v. United States, 49 F.3d 651, 653-654 (10th Cir. 1995).  As the Court of Appeals has observed, however, not every factor applies in every situation, and no one factor in isolation is dispositive; rather "'it is the total situation that controls.'"  Id. at 653 (quoting Bartels v. Birmingham, 332 U.S. 126, 130 (1947)).

Petitioners contend that their relationship to the service providers was not that of an employer to employees but that of a landlord to tenants.  They point to the fact that each week, as a general rule, the spa retained as booth rent the greater of $80 or 25 percent of the service provider's gross revenues.  Although the spa wrote each service provider a weekly check for the balance of the customer fees that it collected, petitioners seem

to suggest that they did so merely as financial intermediaries for the service providers.

We find these contentions unpersuasive. Clients paid the spa, not the service providers. These funds were within the control and disposition of the spa until it paid the service providers by writing them checks.[7] See sec. 1.6041-1(h), Income Tax Regs. (a "payment" is made for purposes of section 6041 information returns when an amount is made available to a person "so that it may be drawn at any time, and its receipt brought within his own control and disposition."). Consequently, we conclude that the spa's weekly checks to the service providers in fact represented payments to them. But this does not answer the question whether the payments were made to the service providers in their capacities as employees or as independent contractors.

Some revenue rulings, concluding that certain beauticians and barbers are self-employed, take into account as part of the analysis the existence of a fixed-fee lease agreement. See Rev. Rul. 73-592, 1973-2 C.B. 338 (beauticians); Rev. Rul. 57-110, 1957-1 C.B. 329 (barbers). Conversely, other revenue rulings, concluding that certain beauticians and similar professionals are

---

[7]Our conclusion in this regard is not altered by the fact that the service providers would sometimes take cash from the cash basket and leave notes. This practice seems to indicate less that the cash was in the service providers' dominion and control than that the spa had a very lenient (and trusting) policy for making cash advances.

employees, take into account that the working space is leased for a percentage of gross receipts. See Rev. Rul. 73-591, 1973-2 C.B. 337 (beautician); Rev. Rul. 73-574, 1973-2 C.B. 335 (manicurist in barbershop); Rev. Rul. 70-488, 1970-2 C.B. 219 (barbers). Similarly, some judicial precedents involving worker classification of beauticians and similar professionals take into account, with mixed results, the nature of leasing arrangements as part of the multifactor common law employment analysis. See, e.g., Wolfe v. United States, 570 F.2d 278, 282 (8th Cir. 1978) (holding that beauticians were employees, taking into account, among other factors, a percentage-basis leasing arrangement); Ren-Lyn Corp. v. United States, 968 F. Supp. 363 (N.D. Ohio 1997) (holding that cosmetologists were not employees, taking into account, among other factors, a percentage-basis leasing arrangement); Henry v. United States, 452 F. Supp. 253, 255 (E.D. Tenn. 1978) (holding that beauticians were not employees, taking into account, among other factors, that they leased working space in the beauty parlor for rent of 40 percent of their proceeds, with minimum rent of $50 per week).

Respondent acknowledges that the spa's payout arrangement is "something of a hybrid" since it includes both a percentage split of gross revenues and a "minimum rent component". But respondent contends that this "minimum rent component" demonstrates "more control over the workers rather than less." If, however, as the

Commissioner's revenue rulings suggest, a fixed rent arrangement evidences self-employment status (since employees do not normally pay their employers rent for their workspace), we have difficulty understanding how a fixed rent component in a percentage payout formula weakens, rather than strengthens, the case for self-employment status.  Although the spa was not wholly consistent in its policies, it appears that the spa generally did charge, and the service providers did generally pay, weekly rent of at least $80.  We take this circumstance into account as one factor weighing against an employer-employee relationship.

The weekly payment arrangement also reflected, in addition to the spa's retention of rent, compensation of the service providers on a straight commission basis, with no minimum guaranteed level of payment.  This circumstance also counts in favor of independent contractor status, see Rev. Rul. 87-41, 1987-1 C.B. at 299, as does the fact that the spa provided the service providers no employee benefits, such as vacation or sick leave, see Weber v. Commissioner, 103 T.C. 378, 393-394 (1994), affd. 60 F.3d 1104 (4th Cir. 1995).

Respondent concedes that the spa did not pay service providers' business or travel expenses and that this circumstance supports independent contractor status.  In addition, it appears that many of the massage therapists made significant investments

in outfitting and decorating their massage rooms.[8] These various circumstances, coupled with the spa's right to collect minimum fixed rent each week, also lead us to conclude that service providers bore the risk of suffering net losses, and in some weeks did suffer net losses, from their operations at the spa. Conversely, the service providers had opportunities to profit by working longer hours, at times coming into the spa for appointments outside the spa's normal business hours. Finally, on the basis of the testimony of several service providers, it appears that they believed that they had a nonemployee relationship with the spa.[9] All these considerations support a finding of independent contractor status. See Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270.

Other factors also point to independent contractor status. Respondent concedes that the spa did not tell the service providers how to provide their services to the clients. In fact, it appears that the spa required the service providers to comply with only a relatively small number of instructions relating to the spa's operation. The service providers were all licensed

_____

[8]Although the record does not similarly establish that the cosmetologists made significant investments, we assign this consideration little weight in our analysis since it would not appear that a cosmetologist would ordinarily require large expenditures to conduct that profession.

[9]For instance, one of the massage therapists testified that in 2004, while operating at the spa, she incorporated her massage therapy business.

professionals, possessing skills as required by their licensing.[10] They set their own hours. Although they provided the spa with their schedules in advance, they changed those schedules as they pleased. And although the spa posted operating hours and attempted to have coverage for all those hours, the service providers were not required to work those hours, and the spa sometimes closed early if no service provider was available to work. Moreover, the service providers might work in the spa outside the posted hours, gaining access to the spa with their own keys. Although the spa posted prices for various services, the service providers were free to charge less and sometimes provided services for free. Similarly, although the spa promoted various "specials", the service providers were free to decide whether they wished to participate. And although the spa assigned walk-in clients on a rotating basis, the service providers retained the right to refuse any client.

Arrayed against these considerations supporting independent contractor status are a number of factors supporting employee status for the service providers. In particular, their services were integrated into the spa's operations; they provided their services mostly, if not entirely, on the spa's premises; the spa

---

[10]Although many of the massage therapists initially trained at Ms. Mayfield's massage school, they paid regular tuition for these classes and had no guarantee of subsequently securing a spot at the spa.

provided at least some informal training to new service providers; there is no showing that the service providers made their services available to the general public (other than by working at the spa) regularly and consistently; they were assisted in booking appointments and in receiving payments by receptionists that the spa employed and supervised; clients paid the spa rather than the service providers; and the spa retained the payments until it distributed the service providers' weekly checks.

Other factors we consider neutral or of limited usefulness to our analysis. For instance, although there was no requirement that the service providers work full time for the spa, and although some of them in fact worked part time and had jobs elsewhere, these circumstances appear consistent with either independent contractor or part-time employee status. Likewise we regard as neutral the fact that the service providers rendered their services personally--a circumstance probably dictated by the nature of the services and the licensing requirements.

Respondent asserts as a factor evidencing an employer/employee relationship that petitioners had the right to terminate the services of any service provider at any time and that any service provider could terminate his or her relationship with the spa at any time. But we are not persuaded that this consideration adds much to our analysis, particularly given the

informal nature of the relationship between the spa and its service providers.  It may, however, help explain what appears to have been a significant level of turnover among the service providers, many of whom operated at the spa for only a short time.  That consideration, in turn, leads us to think that although some other service providers operated at the spa for several years, the work relationship was not necessarily permanent or indefinite, as indicative of employment status.  See Ewens & Miller, Inc. v. Commissioner, supra at 273.  Consequently, we also regard this factor as neutral.

Although this is a close case, weighing all the evidence we conclude that factors indicating the service providers' autonomy predominate over factors indicating petitioners' control over them.  Accordingly, we conclude and hold that the service providers were independent contractors rather than petitioners' employees during the years at issue.

To reflect the foregoing and petitioners' concessions,

Decisions will be entered
under Rule 155.